GEORGE B. RICHARDS, Plaintiff-Appellee and Appellant, *v.* LIQUID CONTROLS CORPORATION, Defendant-Appellant and Appellee.

(Nos. 73-117, 73-150 cons.: ▮▮▮▮▮▮▮▮▮)

Second District (1st Division)—March 6, 1975.

Wildman, Harrold, Allen & Dixon, of Chicago, for Liquid Controls Corporation, in cases 73-117 and 73-150.

Schiff, Hardin & Waite, of Chicago, for George B. Richards, in 73-117 and 73-150.

James B. O'Shaughnessy, of Phelps, Wisc., for George B. Richards, in case 73-150.

Mr. PRESIDING JUSTICE SEIDENFELD delivered the opinion of the court:

George B. Richards (hereinafter Richards) sought a declaratory judgment to interpret the deferred payment provision of a written contract under which he had assigned his patents pertaining to positive displacement meters, air eliminators, valves and proportioners[1] to Liquid Controls Corporation (hereinafter Liquid Controls). The trial judge entered a judgment for Richards in the amount of $276,706.36 and interest, from which Liquid Controls appeals. 73-117.

Richards also filed an action seeking a return of the patents on the theory that the trial court adjudicated that the agreement had been breached. In this suit, however, relief was denied and Richards appeals. 73-150.

The appeals have been consolidated.

Richards is an inventor who, in the early 1950's, developed certain concepts[2] for improving equipment used in control of fluids for industry. In the course of completing patent applications Richards' attorney introduced him to another of the attorney's clients, Mr. Fred Wacker of Ammco Tools Incorporated. Mr. Wacker lacked experience or particular knowledge in the fluids control industry, and Richards prepared an analysis of the market for meters using his rotary displacement device.

After various negotiations, an agreement between Wacker and Richards was reached in April of 1954. Under it Richards was employed in the new venture at a $12,000 annual salary and agreed that any future inventions would become the property of Ammco. Under the agreement Richards also sold and assigned certain patent applications and "inventions disclosed and claimed therein" together with any "improvements" on such inventions which Richards then or thereafter might own. "Improvements" were defined in the agreement to mean "modifications of, mechanical betterments of, and competitive substitutes for" such inventions which Richards then or thereafter owned.

In addition to providing for a lump sum payment of $10,000 to Richards which was paid upon the execution of the agreement, the contract provided for deferred payments in the following language, which is the substantial basis of the dispute:

---

[1] The terminology used is taken from the description used in the preliminary part of the agreement rather than from the patent applications.

[2] Which may be briefly described as: A new and improved valve design; a proportioner or fluid mixing device; an air eliminator used to eliminate pockets of air trapped in fluid flowing through a pipeline; and, a rotary displacement device suitable for creating meters of superior accuracy.

"(b) AMMCO shall make the following deferred payments to RICHARDS for the life of the longest lived patent acquired by AMMCO under paragraph 1 of this Section, unless this agreement is sooner terminated as hereinafter provided:

1) An amount equal to five per cent (5%) of the net selling price of each and every Air Eliminator sold by AMMCO embodying the air eliminator invention or inventions and/ or improvements acquired by AMMCO hereunder;[3] and

2) An amount equal to two and one-half per cent (2½%) of the net selling price of each and every other device sold by AMMCO and embodying the inventions and/or improvements acquired by AMMCO under paragraph 1 of this Section.

(c) 'Net selling price', as used herein, shall mean list price less all trade and cash discounts. Date of sale shall be considered to be date of invoicing.

Only one deferred payment shall be made on each complete device or mechanism sold by AMMCO and embodying any invention and/or improvements conveyed to AMMCO under paragraph 1 of this Section, and no deferred payment shall be made on repair and replacement parts."

Under the agreement no minimum payments were due for the first year; an annual minimum deferred payment of $15,000 was provided for the second year; and during the third and following years an annual minimum deferred payment of at least $25,000 was specified. The agreement also provided that Ammco would keep the records of all of its operations under the agreement "requisite for true determination of deferred payments accruing hereunder to RICHARDS, which records shall be open to inspection by RICHARDS * * *." Ammco further agreed to render quarterly reports "showing the sales and sales price of devices and/or mechanisms sold hereunder."

In 1955, Liquid Controls was created to take over the liquid control business as a separate entity and was substituted for Ammco in the agreement. Initially Liquid Controls produced what it described as the "M-60" meter pursuant to a government contract. In 1957 the "M-7" meter was developed, and commercial sales began to increase. Liquid Controls widened its product line to include numerous attachments by which adaptation of the basic meter models could be created to suit customer interests. Among other attachments, meters were adapted with

---

[3] Payments have been made under this paragraph, and it is not involved in the dispute.

counters, printers, preset counters, air eliminators, strainers, flanges, and faucets.

Richards had been receiving his $25,000 annual minimum deferred payment under the contract but in 1962 became concerned that he might be entitled to more and broached the issue with the company. In the discussions which followed, it became apparent that Richards and Liquid Controls had different impressions of what was called for by the contract, particularly whether or not certain of the concepts were "improvements" of Richards' inventions and what constituted a "device" embodying those inventions. The dispute which affected the amount of deferred payments due Richards was not resolved by the end of 1962, and Richards requested an accounting for the four quarters of 1962. In January of 1963, Mr. Wacker sent a communication to Richards indicating that amounts due in 1962 did not exceed $25,000. Richards disagreed and threatened to resign. There were further discussions and in August of 1963 Richards again requested an accounting and Mr. Wacker indicated that such an accounting would be a practical impossibility. It was therefore informally agreed that Richards would accept an accounting beginning with the year 1963.

Disagreement over the payment basis continued and in 1964 Richards was presented with a partial scheme for computing deferred payments which the parties had referred to as the "M-7 Tabulation." The tabulation was prepared by Robert Pranke, the treasurer and comptroller of Liquid Controls, who had been previously instructed by Mr. Wacker to attempt to reach an accurate determination developed from each invoice for payment of Richards under the contract. It appears from an examination of the M-7 tabulation that the 2½% deferred payment was to be applied to what appeared in the sales brochure as the "A" meter which included the rotary displacement device covered by the patent and a counter which was not. Where the products sold included a strainer or a preset valve, described in the brochure as subassemblies, the deferred percentage was also applicable to these items. The tabulation did not provide for deferred payments on the faucet or printer mechanism when attached to the basic meter.

Richards, however, did not agree with the M-7 tabulation for the reason that in his view it did not comport accurately with his interpretation of the contract. It appears from his testimony that he agreed that if only a basic meter ("A") were invoiced, the computation was correct. But where a printer, strainer, or preset counter were added, he considered them to be an integral part of the meter device which embodied his positive displacement invention and upon which the deferred payment

was due. By July of 1964 Richards insisted that, in accord with his interpretation of the contract, at least $15,000 was due for the year 1963 over the $25,000 already paid. He was thereafter paid accordingly and the necessity for an accounting for that year was eliminated.

When the time came for calculating the payment due for 1964 no agreement had been reached concerning the deferred payments formula. In order to determine a deferred payment which would roughly parallel the $40,000 figure for 1963 which Richards had accepted, Mr. Pranke applied the basic 2½% figure to 95% of the total annual sales. Apparently Richards was not informed of this formula of computation.

In 1964, 1965 and 1966 payment to Richards was made according to this formula (2½% x 95% total of sales). These payments were characterized as "preliminary amounts." Richards testified that although he believed the payments to be a few percentage points less than his due, he accepted them nevertheless.

At approximately this time Richards resigned his position with Liquid Controls, and he received an accounting with indicated to him the formula by which he was being paid in 1964-66. According to this formula the proper payment for 1967 would have been $75,700.

In March of 1968, Richards requested an accounting for the year 1967. He met with Mr. Wacker who explained that following newly obtained legal advice it was the intention of Liquid Controls to pay Mr. Richards only $46,000 for the year 1967. The figure was apparently based upon a letter from Wacker's attorney in which he advised that the 2½% of the net selling price of each and every device sold embodying Richards inventions as provided in paragraph 2(b)(2) of the agreement did not apply to the counter (referred to as the "Veeder-Root" product) or any other item added to the device which was not one of the patented inventions actually assigned by Richards. Richards was informed that if he did not accept the $46,000 there would be nothing and that if it came down to litigation the company could withstand it better than he could. Richards refused the decreased sum. In subsequent months Wacker proposed to pay the full $75,700 for 1967 if Richards would agree to an alteration in the accounting methods from 1968 on. Richards declined, and this law suit followed in July of 1968.

Since the filing of the suit Liquid Controls has paid Richards on a basis which excludes the counter and any other added accessories (except for the air elimination device). Amounts in excess of the totals have apparently been placed in a deferred payment reserve. These amounts reflect the difference between the payments made and what the payments would have been under the formula applied between 1963 and 1966.

In mid-1969 a computerized "Sentinel 10" accounting process was developed which allowed precise computation of amounts due Richards as deferred payments in accordance with Liquid Controls' more current interpretation of the original agreement. The percentage amounts paid were substantially less than the payments made under the 1963-1966 accounting methods.

In the declaratory judgment suit Richards prayed for a construction of the agreement which would define the deferred percentage payment base to be the list price of every device, mechanism or product sold by Liquid Controls which contained or embodied therein one of the inventions or improvements thereof transferred by Richards under the agreement. He asked for money damages for the incomplete payments for 1967 and subsequent years on the basis of the formula developed by Mr. Pranke, that is, 2½% of 95% of the total sales.

73-117

On February 8, 1972, the trial court entered its order in favor of the plaintiff Richards, concluding, *inter alia:*

"1. With reference to the construction and interpretation of the intent of paragraph 2 of Section 1 of the agreement between the parties dated April 19, 1944 [*sic*] as to deferred payments to be paid plaintiff, the intent of the parties as expressed therein was that payment for the inventions would be calculated on an expressed percentage of each and every device embodying the inventions or improvements acquired by defendant under Section 1 of said agreement and that for this purpose, the term 'device' was not intended to be limited to the patentable portion of the invention but rather was intended to include any complete device as sold by defendant for an established list price so long as it contained or embodied therein one of the inventions in question or improvement thereof.

2. The evidence is further clear and convincing that by its conduct and actions, the defendant accepted and agreed to the aforesaid construction and interpretation of paragraph 2 of Section 1 of the said agreement as is evidenced in part, for example, by plaintiff's Exhibits 61 and 62 and by the deferred payments made to plaintiff by defendant for the years 1963 through 1966.

3. It was not the intent of the defendant by designating the deferred payment as 'preliminary' that they be subject to recalculation and reduction by the defendant.

4. The parties did by their conduct agree to a method of cal-

culation of the deferred payments for the years 1963 through 1966 of an amount equal to 2½% of the remainder of the total net sales of defendant less 5%. This method of computation was adopted by the parties as a practical means of most nearly complying with the terms of the agreement which, because of the accounting procedures of the defendant, could not be complied with to the letter. This does not constitute a modification of the terms of the agreement, but defendant by its conduct is bound to pay plaintiff in accordance with this method of calculation until it establishes a proper method of accounting whereby it can determine which of the devices it sells do not embody any of the aforesaid original inventions or improvements thereof and also which sales are repair or replacement parts. To date defendant has not established such an accounting system and is, therefore, obligated to pay plaintiff on the basis of the method established for the years 1963 through 1966, together with interest thereon at the statutory rate since the date such payments were due and payable.

5. The parties are also in dispute as to whether or not the following constitute 'improvements' (as that term is defined in the agreement) of any of the five original inventions. The consumer meter, the reverse flow valve and the random fill nozzle are not 'improvements.' The flow control value is an improvement. As disclosed in plaintiff's Exhibits 44 and 45 and defendant's Exhibit 39, the parties had agreed that as to the air check valve, there would be no deferred payment on the system, but payments would be made on the components of the system covered by the agreement. The court specifically finds that where the air check valve is used in conjunction with the air eliminator, it was the intent of the parties that a deferred payment be made on such components of the air check valve that are thus used."

Liquid Controls contends that the court erred by construing the contract term "device" to mean any product assembly containing a component which embodies an invention covered by the contract. It first argues that there is no ambiguity in the contract and that the term "device" when considered in the context of the entire contract was clearly intended to be limited to the patentable portion of the invention. It reasons that even if the contract is considered to be legally ambiguous the result reached by the court went beyond even the practical construction placed on it by both parties. It points out that the court's construction also creates an ineffectual contract in that by tying the percentage payments to "any complete devices sold by defendant for an established

list price so long as it contain(s) or embod(ies) therein one of the inventions in question or improvements thereof," the court, in effect, sets up a contract that focuses on mere marketing formalities dependent upon what Liquid Controls would assemble and ship in one package. It also argues that although the court so construed the agreement, it did not adopt its own construction since it required that Liquid Controls make payments to Richards according to the 1963-66 "makeshift" formula rather than the contract formula. Liquid Controls further contends that the court erred in holding that the contract required deferred payments based on air check valves that are used in conjunction with air eliminators since these are not "improvements" as defined in the contract.

Richards contends that his invention had the object of providing a rotary positive displacement meter for liquids and that from the outset Liquid Controls intended to produce such meters and to pay him 2½% of the net selling price of each complete device. He further contends that the method of computing deferred payments for the years 1963-1966 constituted a manifestation of the intention of the parties and was correctly established by the trial court to be the proper basis for computing subsequent contract damages. Additionally, he argues that the trial court correctly found that the parties intended a deferred payment on the air check valve when used in conjunction with an air eliminator.

Under the agreement, Richards essentially is to receive a percentage of the income from sales of *devices embodying* his inventions and/or improvements. The products marketed consist of various components joined together to satisfy customers' needs. The question is, which of the various components of the final product sold are contemplated within the terms of the royalty agreement.

■■■ The guidelines for the construction of contracts have been long established. The primary objective is to give effect to the intention of the parties. This is to be determined solely from the language used in the executed agreement when there is not ambiguity, but a strict construction which reaches a different result from that intended by the parties should not be adopted. (*Schek v. Chicago Transit Authority* (1969), 42 Ill.2d 362, 364.) Previous agreements, negotiations and circumstances may be considered in finding the meaning of the words used and when there is an ambiguity, or when the language used is susceptible of more than one meaning, extrinsic evidence is admissible to show the meaning of the words used. *Martindell v. Lake Shore National Bank* (1958), 15 Ill.2d 272, 283; *Kelly v. Terrill* (1971), 132 Ill.App.2d 238, 240.

The basic item patented by Richards is entitled a "Rotary Liquid Displacement Device." The device patented is not itself a meter. However,

the patent claim indicates that the "invention * * * has to do more particularly with such a device which is especially well adapted for use as a liquid displacement *meter* or * * * pump." (Emphasis added.) The item patented is by itself of limited utility. As a meter, however, it is the primary sales item of Liquid Controls.

Evidence was introduced to show that fluid meters consist of two distinct parts. The first is the primary element which is in contact with the fluid, resulting in some form of inner action (displacement device.) The second part translates the inner action between the fluid and the primary element into volumes, weights or rates of flow and indicates (counter) or records (printer) the result. Thus, when the counter is added to a rotary displacement device the yield is a simple meter.

From the preamble of the agreement which makes reference to "Positive Displacement Meters" it seems clear that it was the intention of both parties to sell positive displacement meters and not rotary displacement devices. It would appear therefore that the basic meter is a device or mechanism, more complete in form, but nevertheless embodying, a rotary displacement device.

In paragraph I, 2.(c) of the agreement, the term "net selling price" used as a point of reference for the 2½% royalty payments, is defined and it is further stated:

> "Only one deferred payment shall be made on each *complete device or mechanism* sold by AMMCO and embodying any invention and/or improvements conveyed to AMMCO under paragraph 1 of this Section, and no deferred payment shall be made on repair and replacement parts." (Emphasis added.)

The common meaning of the word "complete" is "lacking none of the parts; full; whole; entire" (Webster's New Twentieth Century Dictionary, Second Edition, Unabridged); or "possessing all necessary parts, items, components or elements" (Webster's Third New International Dictionary, Unabridged). A "mechanism" is defined as "the parts collectively or the arrangement of the parts of a machine" (Webster's New Twentieth Century Dictionary, Second Edition, Unabridged )or "a structure of working parts functioning together to produce an effect" (Webster's Third New International Dictionary, Unabridged).

■■ In light of these definitions it is difficult to conclude that percentage payments should be based solely on the patented portion of the complete devices sold. Rather, in accordance with the lower court's order, percentage payments would appear to have been based on the cost of any complete device as sold by the defendant for an established

list price so long as the device contained or embodied therein one of the inventions in question or an improvement thereof.[4]

The record of the preliminary negotiations between the parties also helps to illuminate the result apparently intended by the parties by their final agreement. After the original contact between Richards and Wacker there were several meetings at which Richards' prior employment arrangements at the Brodie Company were discussed. Mr. Wacker was informed that Richards, in addition to a $22,000 per annum salary, was paid 1% of the total of the *net invoices* of the meter business for the midwest division of Brodie Company. It thus appeared that Richards was then being paid a commission on the sale of whole meters and not on component parts.

Against this background, three letters communicated during preagreement negotiations, are significant. On December 26, 1953, Richards wrote Wacker proposing a compensation formula that included deferred payments of "5% for the first 500 *meters*" and diminishing percentages for additional sales. The proposal included a 1% override upon set sales. On February 12, 1954, Richards sent Wacker a modified proposal but again suggested that on meter sales he receive 5% upon the first 500 units with diminishing percentages for further sales. It appears from these letters that Richards intended to be paid based on a percentage of total meter sales rather than on the specifically patented parts thereof. On March 5, 1954, Wacker wrote Richards setting out a counterproposal. (Plaintiff's Exhibit 7.) In the answering letter Wacker made reference to the fact that Richards would receive a "deferred patent payment based upon 2½% of net selling price of the devices * * *," and in urging Richards to accept the offer wrote:

> "I am in hopes that all of the above will prove agreeable to you, George, as I believe that upon consideration you will realize that by accepting this offer you are more than doubling your salary, improving your income *based on percentage of sales by 2½ times,* not to mention substantially improving your tax picture." (Emphasis added).

---

[4] In Liquid Controls' sales brochure (Plaintiff's Exhibit 18) the rotary displacement device with a counter mounted on it is referred to as the "basic meter assembly 'A'." It is suggested that "to this assembly you may add any sub-assemblies you require" and there are pictured various additions to the meter. In Model "B" a strainer is added and pictured; in "C" an air eliminator is mounted above the strainer; in "D" there is the addition of a faucet; in models "E"—"H" there is the same progression with a printer added; in "I"—"K" the same progression with a preset counter added; and in "L"—"N" again the same progression with printer, counter and preset counter. In the brochure various additional items are labeled as "accessories," such as pulsers, selsyn remote systems, automatic temperature compensators, rate of flow indicators, bulk plant air eliminators, and various swivels, angle adapters, extensions and T-housings.

Since Richards' income at the time was 1% on the invoice of a rotary meter, it would appear to be intended that the 2½% would derive from the invoice of a liquid control meter without breaking the meter into its component parts.

That the parties themselves intended that the "device" referred to in their agreement included more than the rotary liquid displacement patent seems further apparent from the actions and statements of the parties which amounted to a practical construction and interpretation of the disputed contract terms. See *Pocius v. Halvorsen* (1963), 30 Ill.2d 73, 81; *Donahue v. Rockford Showcase & Fixture Co.* (1967), 87 Ill.App.2d 47, 51; *Walgreen Co. v. American National Bk. & Trust Co.* (1972), 4 Ill. App.3d 549, 554; *Continental Television Corp. v. Caster* (1963), 42 Ill. App.2d 122, 132.

In 1962 or 1963, when the dispute over the deferred payment base first arose, Richards and Wacker communicated with one another expressing their respective understanding of the contract terms. In his letters of August 7, 1962 (Plaintiff's Exhibit 45) and January 27, 1963 (Defendant's Exhibit 3), Richards indicated that deferred payments were expected on a *minimum* of the basic meter device consisting of the rotary displacement device, counter, adjustor and companion flanges if necessary for installation.[5] Mr. Wacker, in letters of August 3, 1962 (Plaintiff's Exhibit 44), August 7, 1962 (Plaintiff's Exhibit 45), and January 31, 1963 (Plaintiff's Exhibit 48), apparently felt that only the basic meter, air eliminator, faucet, valve and proportioner were to be included in the computation of deferred payments. The counter, printer-counter, preset counter, adjustor, strainer and flanges were to be excluded in his view. However, the acts of Mr. Wacker and Mr. Pranke, the treasurer and comptroller of Liquid Controls acting under Mr. Wacker's direction, in reaching a determination of deferred payments for the year 1963 indicate a contrary intention. The M-7 formula previously referred to provided for deferred payments to include not only a basic meter, air eliminator, valve and proportioner but a counter, preset valve and strainer as well. This amounted to a practical construction and interpretation of the disputed contract terms as well as an acknowledgment that more than the patented portions of the complete meter mechanism were to be subject to the royalty provision. While it is true that Richards objected to the M-7 formula, he subsequently indicated that according to his interpretation of the contract terms he was entitled to an additional $15,000

---

[5] In testimony regarding these letters, Richards noted that it was his position that the agreement called for a deferred payment on the above described meter only as an absolute minimum and that if the circumstances of installation or the requirements of a customer were such that a strainer, printer or preset was required and that it was part of the meter package, then it became part of the meter.

over the $25,000 minimum for 1963. And it is significant that Richards was paid the amount that he claimed.

Liquid Controls argues that the computation based on net sales was a "makeshift" formula and that it was not intended to be binding on the parties. It refers to the fact that all payments to Richards were noted as "preliminary." The testimony of Mr. Pranke indicated that the amounts noted on the checks paid to Richards were approximations and not intended to be final. Pranke's testimony, however, does not preclude the possibility that the notation was intended to avoid foreclosing Richards' right to determine whether more money may have been due. In addition, Mr. Wacker testified in a deposition as to the meaning of the word "preliminary" that it meant the total amount Richards was paid on deferred payments for the year 1963 including the guaranteed minimum and that it actually ended up as a final total. The trial court found that it was not the intent of the defendant by designating the deferred payments as "preliminary" that they be subject to recalculation and reduction by the defendant. This finding does not appear to be contrary to the weight of the evidence.

The amounts due under the formula which was developed for making the deferred payments in 1964, 1965 and 1966 which yielded 2½% of 95% of the total meter sales almost precisely reflected the payments which Richards said were intended and which he desired under his construction of the contract terms.

We are not persuaded by defendant's argument that its contrary interpretation of the contract is "rooted in the basic structure of the sale of Mr. Richards inventions." Liquid Controls argues that it is clear from the negotiations and from the contract terms that they were buying and paying for "concepts rather than hardware" and that the ordinary language, "device * * * embodying the inventions" means the unit of mechanical equipment which translates the concepts to tangible hardware (i.e., the physical unit consisting of the specially designed housing and rotors without any other device which might be attached to the unit to form any combination of equipment). It seeks to buttress this argument by reference to the fact that patents provide a legal monopoly only for those items set forth in the formal patent claims, citing *Morton Salt Co. v. G. S. Suppiger Co.* (1942), 314 U.S. 488, 86 L.Ed. 363, 62 S.Ct. 402. And, it reasons, the "law of patents frowns on the misuse of a patent to generate royalty payments on devices outside the scope of the patent," citing *Morton Salt Co. v. G. S. Suppiger Co.* and *Glen Manufacturing, Inc. v. Perfect Fit Industries, Inc.* (S.D. N.Y. 1969), 299 F. Supp. 278. These cases, however, are not relevant. Here, Richards has neither conditioned the license of his patent upon the purchase of unpatented items

as in *Morton Salt* nor conditioned the granting of a license on the payment by the licensee of a royalty on the manufacture and sale of similar items which do not embody the patent. The lower court's construction of the contract merely entitled Richards to deferred payments on completed devices embodying his inventions, not to payments on any separate, unrelated, nonpatented items.

Nor are we persuaded by defendant's further argument that the 2½% deferred payment on complete meters is disproportionate. This premise seems to be entirely unwarranted. (See, for example, *American Photocopy Equipment Co. v. Rovico, Inc.* (N.D. Ill. 1966), 257 F. Supp. 192, 199-200.) In *American Photocopy,* a 6% royalty on the retail list price (amounting actually to 12% of the manufacturing cost of the whole machine and 24% of the patented portion thereof) was upheld.

Liquid Controls next argues that the court erred in holding that it was bound to make payments to Richards according to the 1963-66 formula until it establishes a proper method of accounting to determine which of the devices it sells embodies or does not embody any of Richards inventions or improvements, and also which sales are of repair or replacement parts. It reasons that although prior to the court's order of February 8, 1972, there was a conflict as to payments required under the contract, the court's order now construes the contract and subsequent payments must be made in accordance therewith and not in any other manner. It argues that, assuming the court's construction to be correct, Richards had suffered only the failure to receive the contract payments for 1967-71, and it was improper for the court to create a new contract in lieu of an assessment of the contract damages, citing *R. F. Conway Co. v. City of Chicago* (1916), 274 Ill. 369, 378; *Bohnert v. Ben Hur Life Association* (1936), 362 Ill. 403, 408; *Sweeting v. Campbell* (1956), 8 Ill.2d 54, 58; and *Texas & P. Ry. Co. v. City of Marshall* (1890), 136 U.S. 393, 34 L.Ed. 385, 10 S.Ct. 846.

We are unable to conclude, however, that the trial judge did in fact create a new contract. Rather, we agree with the contention of Richards that the court was not establishing a new contract by its order, but was in effect ordering defendant to continue to comply with the terms of the contract in the only practical way which was then available. The contract required Liquid Controls to establish a "proper method of accounting." Until it did so the trial court held it must follow its own established method employed from 1963 through 1966. We do not find that this was improper.

The agreement provided:

> "6. AMMCO shall, and agrees to, keep true records of all of its operations under this agreement, including licensee or other

third party operations, requisite for true determination of deferred payments accruing hereunder to RICHARDS, which records shall be open to inspection by RICHARDS or his accredited agent at any reasonable time during business hours. AMMCO further agrees to render to RICHARDS quarterly, within the respective months of January, April, July and October, of every calendar year during the life of this agreement, a written report showing the sales and sales prices of devices and/or mechanisms sold hereunder by it and by all licensees or other third parties, during the just-elapsed calendar quarter, and with such report AMMCO shall, and agrees to, remit to RICHARDS the deferred payment amount accrued and payable to RICHARDS with respect to such just-elapsed calendar quarter."

The question of an accounting did not arise until 1962. Prior to that time the $25,000 minimum which Richards was receiving was ample on any theory. In mid-1962, however, Richards began to believe that his deferred payment should exceed $25,000 and requested an accounting from Mr. Wacker. In early 1963 when Richards' request for an accounting for the four quarters of 1962 was formalized, the dispute over contract terms arose. According to Richards' testimony, Mr. Wacker responded that the deferred earnings did not exceed $25,000 but that in any event, making such payments in excess of the minimum as well as taking the time to reconstruct the sales record would cause an extreme hardship. Richards testified that Wacker told him that it was not possible to arrive at an accounting because a suitable accounting system as specified in the agreement did not exist. The accounting problem was discussed thereafter and at a meeting in August of 1963 Richards made another request for an accounting. Again, according to his testimony, Wacker told him that he felt that such an accounting would be a practical impossibility and Richards was convinced to accept an accounting beginning with the first quarter of 1963. Richards testified that during the meeting one of his attorneys told Wacker that he would be glad to cooperate in any way possible in simplifying the accounting methods and that if it was costly and time consuming to account on the basis of the agreement, one solution would be to simply pay Richards 2½% of all meter sales. There was no discussion of this proposal.

In February, 1964, as previously indicated, comptroller Pranke was charged with devising an accounting system that would work and also satisfy the contract. The M-7 formula previously referred to was then tendered and, as indicated, rejected by Richards. Nevertheless, Richards was paid the sum of $15,000 in excess of the minimum as he requested.

Subsequently the formula system based on 95% of sales became the basis for the accounting. While the so-called "Sentinel 10" computer accounting system was developed in 1969 and permitted a complete breakdown of all costs of meter components sold in yearly sales, it was apparently programmed to eliminate payments on items which the court found to be included under the contract and which were apparently included in previous computations.

■■ Viewed in this chronology it is quite understandable that the trial court would require that the deferred payment base be calculated as the parties had done between 1963 and 1966 until a proper method of accounting in conformity with the contract was in operation. This in our view was not the making of a new or different contract for the parties.

Liquid Controls next contends that the trial court erred in holding that the contract required deferred payments based on air check valves used in conjunction with air eliminators. In an exchange of letters the parties had agreed (Plaintiff's Exhibits 44 and 45, Defendant's Exhibit 39) that as to the air check valve there would be "[n]o payment on system; only on components of system covered by Agreement." Noting this, the trial court specifically found that where the air check valve is used in conjunction with the air eliminator it was the intention of the parties that a deferred payment be made on such components of the air check valve that are thus used. We agree.

■■ It appears from the evidence that the purpose of an air eliminator is to draw out of the line through which liquid flows any segments of air that might have entered and which might be registered as additional liquid on the counter. The air check valve, when used in conjunction with an air eliminator, stops the flow of the liquid until the air eliminator can adequately dispense the air in the line. While the air check valve is not always used in conjunction with an air eliminator, it appears to be reasonable to conclude, as did the trial court, that when it is used in conjunction therewith it is an integral component of the air eliminator system as well as an improvement of the air eliminator. While there was contradictory expert testimony on the question of whether the air check valve was in fact an improvement of the air eliminator, we cannot say that the finding of the trial court is against the manifest weight of the evidence and therefore we will not disturb the finding.

For the reasons which we have stated we therefore affirm the judgment of the trial court in favor of the plaintiff, George B. Richards, in appeal No. 73-117.

73-150

Richards prayed in his complaint as amended that all patents assigned under the agreement be reconveyed to him because of Liquid Controls' breach of the agreement and failure to cure the breach within the time specified in the agreement. On October 12, 1972, the trial court denied relief and Richards has appealed from that portion of the judgment below.

That part of the agreement upon which Richards relies is:

> "11. RICHARDS, in addition to the right provided in paragraph 4 of this Section, shall have the right to cancel this agreement for any other breach thereof by giving AMMCO ninety (90) days' written notice of intention so to cancel, and specifying the breach, —provided, always, that said ninety (90) days shall stand as days of grace in which AMMCO may make good, *nunc pro tunc*, its default, in which event this agreement shall continue in full force and effect and no cancellation shall result.

> 12. Upon termination of this agreement by either party, all deferred payments made hereunder by AMMCO to RICHARDS shall be retained by RICHARDS as his own forever, and AMMCO agrees that, in case of any such termination, it will reassign to RICHARDS all of the inventions and improvements conveyed by RICHARDS to it under paragraph 1 of this Section, including without limiting the foregoing generality, any and all applications for patents filed and patents granted for said inventions and improvements. It is further understood that termination of this agreement by either party, for any cause or reason, shall not relieve AMMCO of its obligation to pay RICHARDS any and all deferred payments due and owing as of the date of termination."

The judgment order entered below on February 8, 1972, contained the following:

> "7. Defendant has breached the terms of the agreement between the parties by failing to make the deferred payments due and owing the plaintiff and the letter of plaintiff of April 27, 1970 giving notice of intent to terminate the agreement for breach of contract constitutes a valid notice of such intent to terminate; however, defendant is granted 90 days from this date to make good its default.

> It is, therefore, ordered that defendant shall make the deferred payments as set forth in the aforesaid paragraph 4 of this order within 90 days hereof and thereafter, upon evidence being submitted that defendant has not so complied, this court will enter

judgment against the defendant for the amount due plaintiff for deferred payments as required in paragraph 4 of this order and will also adjudge and decree that the agreement between the parties is terminated and defendant shall forthwith reconvey to plaintiff all the inventions and patents thereon as required by paragraph 12 of Section 1 of the agreement between the parties."

Subsequently on September 21, 1972, the court made the further order that if its judgment were not appealed or if the judgment is appealed and is ultimately affirmed on appeal and the defendant fails to satisfy the judgment within 90 days of the final disposition of the appeal, the court would consider the agreement terminated and defendant would be directed to convey all of the inventions and patents as required by paragraph 12 of section 1.

Richards argues that he was entitled to a reconveyance when, within 90 days after the notice of intent to terminate, the breach had not been cured. That, in any event, he was entitled to such relief following 90 days after the trial judge's original order of February 8, 1972 and that it was error for the court to extend the time for the pendency of the appeal.

Liquid Controls argues that the trial court was correct in providing that the litigation preserved the 90 day redemption period.

■ While recognizing the rights of parties to incorporate forfeiture provisions in contracts, equity will only permit a forfeiture where the right is clearly and unequivocally shown. ( *Miles Homes, Inc. v. Mintjal* (1974), 17 Ill.App.3d 642, 646.) Under the circumstances of the present case we are unable to conclude that such a showing has been made.

On April 27, 1970, during the pendency of the declaratory judgment action, the plaintiff sent a communication to Liquid Controls purporting to be a notice of his intent to cancel the contract and require reconveyance of the patents if the alleged underpayments were not cured within 90 days following receipt of the letter. On May 22, 1971, prior to expiration of the 90-day period, Mr. Wacker replied by personal letter, indicating therein his continuing disagreement regarding the contested contract provisions as well as a denial of any breach of the agreement. In accord therewith, and on June 15, 1970, the defendant filed a counterclaim in the pending declaratory judgment action seeking a declaration that the April 27 notice of intent to terminate was null and void or, that, under the circumstances, the 90-day redemption period should be computed from the date the original declaratory judgment action was consummated. This served to place the contested issues before the court. Subsequently, during the course of the lawsuit and in post-trial proceed-

ings, Liquid Controls took efforts to litigate the forfeiture provision and to stay its enforcement during appeal. There does not appear to be sufficient grounds to permit Richards to unilaterally terminate the agreement before the pending declaratory judgment action has been finally adjudicated, in the absence of a showing that Liquid Controls seeks to ignore the determination of the court when it is finally clarified by judicial action, and in light of the substantial basis for the dispute between Richards and Liquid Controls as to the construction of the various portions of the agreement in question.

The plaintiff argues that his position finds support in the cases of *National Rejectors, Inc. v. A.B.T. Mfg. Corp.* (7th Cir. 1950), 184 F.2d 612, and *National Pigments & Chemical Co. v. C. K. Williams & Co.* (8th Cir. 1938), 94 F.2d 792. We do not agree. Both cases deal with licensing agreements and not the outright sale of patents as here so that the question of a forfeiture is not involved. Moreover, in *National Rejectors* the license agreement provided for a redemption period to cure a breach of contract, and in the event there was no cure, the licensor could terminate the defendant's privilege to use the inventions. The court held that the defendant, who failed to make good the default within 90 days or to respond in any other manner until suit was brought against it, could not prevail. The court, however, expressly noted (page 616) that throughout the extended intervals during which plaintiff claimed defendant was infringing, defendant might have made known its position by filing a suit for declaratory judgment, making a deposit and awaiting determination of the court, but instead took no steps to protect itself. Here, the issue of the breach of the contract which was a condition to the forfeiture was already before the court, and Liquid Controls took the further step of filing a timely counterclaim on the issue of the right to redeem once the plaintiff's position was clarified.

In *National Pigments*, a 30-day period was an allowance of time for the licensee to wind up operation without being immediately liable for infringement of patents, and no redemption period was involved as in the case before us. Compare *Bee Machine Co. v. Freeman* (S.D. Ohio 1939), 40 F.Supp. 299.

 The very purpose of the declaratory judgment procedure is to obtain a judicial resolution of an actual controversy without requiring the disputants to irrevocably jeopardize their rights. (*La Salle Casualty Co. v. Lobono* (1968), 93 Ill.App.2d 114, 117.) In the process of reaching a result under a declaratory judgment action, the trial court is able to render any further relief necessitated by its deliberations. (*La Salle National Bank v. International Ltd.* (1970), 129 Ill.App.2d 381, 398-399; *Koziol v. Village of Rosemont* (1961), 32 Ill.App.2d 320, 329.) Under the

circumstances of this case, we therefore conclude that the trial court properly suspended the operation of the redemption time during the pendency of the appeal process.

For the reasons stated we affirm the judgment below.

Affirmed.

GUILD and HALLETT, JJ., concur.