FRANK A. ISABELLI, Plaintiff and Counterdefendant-Appellee, *v.* CURTIS 1000, INC., Defendant and Counterplaintiff-Appellant.

(No. 75-91;

Second District (1st Division)—September 22, 1975.

Richard R. Haldeman, of Williams, McCarthy, Kinley, Rudy & Picha, of Rockford, for appellant.

Robert A. Frederickson, of Reno, Zahm, Folgate, Skolrood, Lindberg & Powell, of Rockford, for appellee.

Mr. JUSTICE HALLETT delivered the opinion of the court:

The plaintiff instituted this action against his former employer, Curtis 1000, Inc. (Curtis), seeking a declaration that a covenant in his employment contract restraining him from soliciting from former customers or in territory where he had formerly solicited was invalid. He also sought to recover certain sums under a territorial realignment agreement and under a profit-sharing retirement trust. The defendant counterclaimed, seeking injunctive relief. Although a temporary injunction was granted on August 5, 1974, the trial court, after a trial on the merits on October 8, 1974, held the restrictive covenant void as to all areas not involved in the territorial reassignment for want of a valid protectable business interest and awarded sums sought by the plaintiff. The defendant appeals, contending that the restrictive covenant was valid and enforceable as to the whole territory, that plaintiff was not entitled to payments for the territorial realignment once his employment was terminated and that he forfeited his rights under the retirement fund when he violated the terms of the restrictive covenant. We disagree on all three points and therefore affirm.

At the hearing on the merits, the only testimony was that of the plaintiff, of Mr. Tobin, a Divisional and Regional Manager for Curtis and of

Janice Maitland, an employee of Alpine State Bank. There was very little disagreement as to the material facts.

The plaintiff was hired by Curtis sometime in June, 1962, as a salesman, originally on straight salary. He was first sent to Minneapolis, Minnesota, for ten days' training and product familiarization program, during which time his salary was paid. On June 25, 1962, the two parties signed a form employment agreement which contained the following pertinent provisions:

"1. TERRITORY.

(a) The Salesman's territory or accounts which he is authorized to sell, shall be as follows, subject to correction and modification by the Company:

*The following counties in N.W. Illinois: Jo Davies, Carroll, Stephenson, Ogle, De Kalb, Winnebago (except S. Beloit).*

(c) It is mutually understood and agreed that one or more additional salesmen may be assigned later in the general area in which the above described territory or accounts are located. When this does occur, the general area, including the above described territory or accounts, will be divided between the Salesman and such other additional salesman or salesmen.

If and when such geographical divisions or individual account reassignments are made, the Salesman protected by this agreement will be compensated during a limited period for the commission earnings on all established business which he relinquishes from the time that such division of territory or accounts becomes effective. The first month after this division becomes effective, the Company agrees to pay as compensation for such territory or account adjustments, a sum of money equal to the actual average monthly commission earnings for the previous twelve months on the established accounts that the Salesman relinquishes. Subsequent monthly payments will be on the following basis:

(i) When this average monthly commission earnings figure is less than $100, subsequent payments to the Salesman will diminish each month by ten percent of the first payment, until the payments run out.

(ii) When this average monthly commission earnings figure is from $100 to $200 inclusive, subsequent payments to the Salesman will diminish by $10 less each month until the payments run out.

(iii) When this average monthly commission earnings figure is more than $200, subsequent payments to the Salesman on the

first $200 will be in accordance with (ii); subsequent payments on the amount in excess of $200 will diminish each month by four percent of the first payment, until the payments run out.

\* \* \*

## 7. GENERAL TERMS.

(c) The Salesman agrees to keep confidential such information as the Company may, from time to time, impart to him regarding its business affairs (including the names of customers), and agrees that he will not at any time disclose said information in whole or in part to any person not in the employ of the Company. Further, and in consideration of the time and expense incurred by the Company in training the Salesman, and recognizing the highly competitive nature of the Company's business, the Salesman covenants and agrees that, during his employment with the Company and for two years following the termination thereof, he will not, directly or indirectly, either on his own behalf or for others, take or solicit orders for printing, envelopes or other products he has been selling for the Company in any territory in which he has solicited business for the Company or from anyone from whom he has solicited such business."

The Salesman's Profit-Sharing Retirement Plan, *inter alia,* contained the following provision:

"9. *Restrictive covenant.* If any participant who has not received distribution of his entire interest in the plan shall commence competition with the Company, then such competition shall be sufficient cause for the discontinuance of any further payments to such participant, and shall result in a forfeiture of all remaining benefits due such participant, except for such amounts as are vested in such participant's accounts (pursuant to Section 3 of Article VII hereof) as the result of the termination of the plan or the discontinuance of contributions by the Company, which amounts may in no event be forfeited. For such purposes, competition shall be deemed to include the engaging as a principal, partner, agent, servant or employee in a business which competes with the business of the Company in any area of the United States served by the Company and in which such employee worked as an employee of the Company during any portion of two years prior to the termination of his employment with the Company and shall be limited to competition which occurs within a period of two years after the participant ceases to be employed by the Company. Competition shall also be defined as the

breach of any restrictive covenant or covenants by the participant binding him with respect to the Company, whether more or less restrictive than the foregoing."

The plaintiff testified that he only read the description of the plan in a booklet which was given to every employee. Apparently that booklet, which was not abstracted, contained no reference to a restrictive covenant. It did however on the last page state that it was intended only as an outline of the retirement plan, not as a complete description and that the governing documents could be examined for an exact statement. Moreover, Mr. Tobin testified that this forfeiture provision had been explained to the sales force in 1973.

Sometime after the agreement was signed the plaintiff was paid on a straight commission basis. He had an office in his home and paid for all his own expenses except that he and Curtis shared the expense of the telephone calls into the plant and Curtis paid for the telephone answering service.

As far as Curtis was concerned, the plaintiff apparently was the exclusive salesman in the six-county area until 1973. As far as he knew no other salesman came into the territory. If a sale was made in the territory he received the commission on the sale whether it was made directly through him or directly to the company. However there were 40 or 50 competing companies calling on the same accounts.

While with Curtis, the plaintiff sold a variety of envelopes, letterheads specially printed with the name of the customer, memorandum pads also with the name of the customer, a few snapout forms and some miscellaneous products. He sold a few flat forms, primarily like those used in banks. He also sold some large storage boxes and some coin wrappers. The bulk of the sales was in envelopes. He did not have a catalog to show the customers but he did have samples and descriptive literature. He sold from a price book. Some of his customers were banks. Central National Bank off and on was one of his customers. Its orders might be substantial. If a business did not buy a product from Curtis within two years, it is no longer a customer of Curtis.

In the three years before 1974, the sales in the plaintiff's territory fell off and the company was not satisfied with his performance. Although no one had accompanied him on his rounds when he was introduced to his territory, periodically someone would go around with him and make a personal critique of his performance. One of the reasons his sales dropped was that he was injured in an automobile accident in 1972. In July, 1973, the company reassigned the territory reducing his territory to De Kalb County, a portion of Ogle County and a portion of Winnebago County including 57 reserved accounts in the City of Rockford. This was done so

that he could concentrate his efforts on the smaller territory and develop it more than he had in the past. The reserve accounts were not necessarily all current customers of Curtis. The plaintiff was to receive a total of $2,976 at a declining rate over 24 months. This was in accordance with the employment contract and also with a letter of January 12, 1973, discussing the proposed realignment which stated in part:

> "Please remember, Frank, that any territory taken on a territory readjustment will be reimbursed to you based on the dollar commissions in 1972. This is clearly spelled out in your sales contract, and I can assure you that the Illinois Division goes one step further, making it a full and total payback and not a percentage payback."

The plaintiff never received any other types of written document other than the sales agreement which spelled out how the repayments were determined and he believed himself to be protected by that agreement. Surprisingly, considering the existence of the written contract, Mr. Tobin testified that the agreement did not have any percentage or state the period of time and that these were left up to rules of the company and to oral agreements with the salesman. The plaintiff was not specifically informed (other than by the wording of the employment contract) that the payments would continue if he were fired.

On January 25, 1974, the plaintiff was requested to meet with Mr. Ludin at 9 a.m. Friday, February 1, at Henrici's. When he arrived, he was asked to resign although he had not been given the written notice required by the employment contract. His answering service had already been instructed to tell customers who called that Mr. Isabelli was no longer with the company. While he protested, he signed a previously prepared resignation. In return the company gave him the following letter agreement:

> "Contingent upon the resignation of Frank Isabelli effective January 31, 1974, Curtis 1000 agrees to assist Mr. Isbaelli in the procurement of a new position by paying any necessary employment agency fees. Curtis 1000 also agrees to allow Frank Isabelli to continue Blue Cross-Blue Shield Hospitalization Insurance for the months of February, March, and April of 1974. Naturally, this will terminate if future employment takes care of this matter.
>
> The Curtis 1000 Profit Sharing Fund also agrees to pay Mr. Isabelli the sum of $3,350 in equal payments of $186.11 over a period of eighteen (18) months commencing with March 1, 1974. The amount of $3,350 available in profit sharing was computed as follows: at the end of 1971 Mr. Isabelli's account amounted to $4,500. The entire fund's earnings depreciated during 1973 and

Mr. Isabelli's account had $3,734 in it at the end of 1973. To this amount the company contributed $450, putting the Isabelli account to $4,184. Since Mr. Isabelli has not been in the fund for a period exceeding ten (10) years, his vested interest amounts to 80% or $3,350.

Curtis 1000 also agrees to give Mr. Isabelli one month's pay computed as follows: the average commission earnings for the months of July, August, September, October, November and December, 1973, plus the agreed upon territorial realignment payback for the same months. This check amounts to $898.54."

He was told by Mr. Tobin that he would not get any more of the agreed upon payments for the territorial realignment. He turned in his customer cards and price book as requested. He was not told he could go out and complete orders that were in the process of being made to him and that he would get the commission. Rather, when he reached his home a Curtis truck was waiting there to pick up his files. The new salesman was given the list of the Curtis customers. Mr. Tobin testified that the plaintiff owed the company some money in charge-backs and that he told him that that was cancelled. The plaintiff, however, testified that he was unaware at the time of his termination that he owed any charge-backs.

After he was fired, the plaintiff began to work for D & D Printing and Advertising and its subsidiary Steiner Office Supply. He did some purchasing, soliciting and public relations. He sold very little.

During the time plaintiff worked for Curtis, he developed personal contact with many customers. Knowing these people on a first-name basis got him off to a head start in selling products. After he began working for D & D and Steiner, plaintiff went back to these former customers who were friends of his and thanked each of them for the time and business they had given him while he worked for Curtis. Occasionally, he told them he was then employed by a different company. He left a Steiner Office Supply catalog with some of them. Not all the people he contacted were in the territory where he had previously been employed by Curtis.

While at one point plaintiff stated that the products he now sold were the same or similar to those sold by Curtis, the rest of his testimony contradicted this. Among the items he now sells are office products, furniture, office equipment, adding machines, calculators, typewriters, brochure pieces, booklets, pamphlets, salesman sheets, and printed book work, none of which were, to the best of his knowledge, sold by Curtis. He also handled stuffers, napkins and wedding invitations. They do carry stationery which is similar to that handled by Curtis. The catalog does list some envelopes and forms. Some of the items in the catalog were available from Curtis and some were not. If someone wanted snapout

forms, Isabelli would have to refer him to the company specialist in those forms. Moreover, he did not sell envelopes for Steiner because they are carried in the store in broken boxes for the public to come and buy. He doesn't sell them in large units. The company does sell invoices or statements but he had not. It would be within his prerogative to take that business and refer it to someone else.

Plaintiff testified that he might have pursued old customers if the temporary injunction had not been granted. He did not, however, think that he would now even if the permanent injunction is vacated. Indeed, there was almost no evidence in the record indicating that he had sold competing items to former customers or that he had caused them to buy from D & D or Steiner.

The trial court ruled that Curtis had a protectable business interest only in the territory relinquished by plaintiff in the July, 1973, agreement. It dissolved the temporary injunction as to the other areas. It granted a permanent injunction restraining plaintiff from soliciting and selling envelopes, letterheads, stationery, snapout forms, Liberty storage boxes and coin wrappers in the ceded territory until July 19, 1975. It also awarded $1,101.12 as the balance due under the territorial realignment agreement and $2,977.78 as the amount due under the profit-sharing fund. Only the defendant appeals.

The defendant's *first* contention is that the restrictive covenant is valid and enforceable as to the entire territory.

While it is true that some of the older cases did say, as did *Jules Chain Store Corp. v. Stone* (1942), 316 Ill.App. 45, 46, 43 N.E.2d 849, that: "[w]here the contract of employment contains a covenant not to engage in a rival business, and the restraint is reasonably limited as to time and place, and supported by valuable consideration, it is valid and enforcible" (see also *Old Rose Distilling Co. v. Feuer* (1916), 202 Ill.App. 210; *Jewel Paint & Varnish Co. v. Walters* (1950), 339 Ill.App. 335, 343, 89 N.E.2d 835); and a number of cases involving doctors joining and then leaving clinics came out in somewhat the same manner (see *Ryan v. Hamilton* (1903), 205 Ill. 191, 68 N.E. 781; *Storer v. Brock* (1933), 351 Ill. 643, 184 N.E. 868; *Bauer v. Sawyer* (1956), 8 Ill.2d 351, 134 N.E.2d 329; *Canfield v. Spear* (1969), 44 Ill.2d 49, 254 N.E.2d 433; *Cockerill v. Wilson* (1972), 51 Ill.2d 179, 281 N.E.2d 648); the law relating to employees has changed considerably since about 1960.

In *Brunner & Lay, Inc. v. Chapin* (1961), 29 Ill.App.2d 161, 172 N.E.2d 652, in reversing an injunction enforcing a negative covenant against a former employee, the First District, at pages 165 and 167, said:

"A search of the authorities discloses that in cases where the court has enforced a negative covenant by an employee not to

work for another, the element of trade secrets or unfair dealings has been controlling and important. * * *

         * * *

       * * * Depriving a person of his right to work is a drastic method at best, and should only be invoked where irreparable injury is being done to the employer. * * *"

To the same effect, see also *Snyder v. Hamilton* (3d Dist. 1963), 39 Ill. App.2d 352, 365, 189 N.E.2d 97; *In re Solar Textiles Co. v. Fortino* (1st Dist. 1964), 46 Ill.App.2d 436, 441-42, 196 N.E.2d 719; *Vander Werf v. Zunica Realty Co.* (1st Dist. 1965), 59 Ill.App.2d 173, 179, 208 N.E.2d 74; *House of Vision, Inc. v. Hiyane* (1967), 37 Ill.2d 32, 37-38, 225 N.E. 2d 21; *Professional Business Management, Inc. v. Clark* (3d Dist. 1967), 83 Ill.App.2d 236, 242, 227 N.E.2d 371; *United Travel Service, Inc. v. Weber* (4th Dist. 1969), 108 Ill.App.2d 353, 357-58, 247 N.E.2d 801; *Nationwide Advertising Service Inc. v. Kolar* (1st Dist. 1973), 14 Ill.App. 3d 522, 528-29, 302 N.E.2d 734.

Perhaps the latest case on the point is *Leavitt Co. v. Plattos* (1975), 27 Ill.App.3d 598, 327 N.E.2d 356, where, in affirming the dismissal of the former employer's complaint, the First District, at page 602, said:

       "The fatal weakness in plaintiff's case arises from the fact that neither the allegations of his complaint, nor the evidence that he adduced, show the existence of any trade secret, or process, or secret information of any kind. Thus, plaintiff has completely failed to allege and prove that his business would be irreparably damaged by violation of the restrictive covenant and therefore he has failed to show that the restraint sought by the covenant was reasonably necessary to protect his business."

Applying the legal principles laid down in these more recent cases to the facts of the case at bar, we have no difficulty in holding that the trial court correctly held the restrictive covenant void as to all areas not involved in the territorial realignment for want of a valid protectable business interest and in denying an injunction as to such areas. No trade secrets or formulae are involved, no irreparable injury to the defendant was shown and all that we really have here is a restraint covenant intended to prevent competition per se.

■■ We therefore conclude that the defendant's first contention—that the restrictive covenant was valid and enforceable as to the entire territory—is without merit.

We now pass to the defendant's *second* contention—that the plaintiff was not entitled to further payments for territorial realignment once his employment was terminated.

■■ The 1962 employment contract provides that in case of any reas-

signment of territory, the salesman shall be paid, for the first month after the division becomes effective, a sum equal to the average monthly commission earnings for the previous year for that territory and that subsequent payments shall diminish by a subsequent amount each month until "they run out." This is the only termination provision and the language is clear "until the payments run out," that is until they are reduced to zero. Since no other termination provision was expressed in the contract, no other can be assumed. To add a termination provision not included in the contract would be to alter the provisions agreed upon by the parties and this the court cannot do. (*Knockaert v. Studebaker Corp.* (1967), 84 Ill.App.2d 16, 228 N.E.2d 101.) Moreover, equity will only permit a forfeiture where the right is clearly and unequivocally shown. (*Richards v. Liquid Controls Corp.* (1975), 26 Ill.App.3d 111, 325 N.E. 2d 775.) While this court has been unable to find a similar case in Illinois and none was cited to it, a similar result was reached by the Fifth Circuit in *Morris v. Federated Mutual Insurance Co.* (5th Cir. 1974), 497 F.2d 538. There an insurance agent was requested to transfer certain accounts. In return the insurer agreed to pay $7,352, in monthly payments extending over a five-year period. No reference was made in the letter agreement to the effect of a termination of employment. The court held that the duty to make these payments was not extinguished by the mere fact of termination.

If the employer had intended to make the payments conditional upon continued employment, it could easily have so provided. The defendant's argument that it would be incongruous to expect Curtis to instill confidence in a salesman after a territorial realignment to comment that the subsidy would stop if he were later fired, overlooks the fact that the realignment agreement is merely one part of the form employment contract. In that same contract, contrary to the defendant's argument, is a provision controlling who can terminate in general, provisions allowing immediate termination without notice for failure to comply with instructions, a provision barring competition for two years after termination and a statement that employee termination forfeiture prior to age 65 are stipulated in the Retirement Trust. This court must construe the employment contract as a whole. (*Knockaert v. Studebaker Corp.* (1967), 84 Ill.App.2d 16, 228 N.E.2d 101; *Dasenbrock v. Interstate Restaurant Corp.* (1972), 7 Ill.App.3d 295, 287 N.E.2d 151.) And reading the employment contract as a whole, it is clear the employer did provide for termination and the effect of termination and could have provided for the cessation of payments upon termination had it so intended.

■■ This agreement was not altered by the letter of January 12, 1973, which refers to the terms of the sales agreement and the defendant has

not contended that it did. And of course Mr. Tobin's construction of the agreement either on February 1, 1974, or on the witness stand cannot serve unilaterally to destroy the protection given plaintiff by the sales contract.

We therefore conclude that the defendant's second contention—that the plaintiff was not entitled to payments for territorial realignment once his employment was terminated—is without merit.

This brings us to the defendant's *third* contention—that the plaintiff forfeited his rights in the retirement fund when he violated the terms of the restrictive covenant.

Since the restrictive covenant was too broad, it is doubtful that the forfeiture clause in the retirement trust is enforceable. (See *Johnson v. County Life Insurance Co.* (1973), 12 Ill.App.3d 158, 300 N.E.2d 11.) Nevertheless, we need not decide that question. The parties expressly agreed in the letter signed on February 1, 1974, that the fund would pay plaintiff the sum of $3,350 in equal payments of $186.11 over an 18-month period. This promise was unconditional; in no way did it indicate it was dependent upon an unexpressed agreement not to compete.

██ Defendant in arguing that the payment of these funds had to be in accordance with the Plan overlooks the fact that the letter was a clear modification of the terms of the plan as to payment. Normally, the funds were not payable until retirement; here they were payable over the next 18 months. Normally, there were conditions attached to the payments; here none were specified. The employment contract provided it could be modified by a written supplemental agreement; no contention has been made that the agreement was unauthorized. As held by the trial court, plaintiff's resignation was clearly in consideration of this agreement. Curtis had no right to fire the plaintiff as of January 31, 1974. The contract of employment, which was binding on both parties, provided that either might terminate the agreement upon giving a one-week written notice of his intention to do so. The plaintiff was entitled to this notice and his termination without prior written notice was breach of the contract. (*Aristocrat Window Co. v. Randell* (1965), 56 Ill.App.2d 413, 206 N.E.2d 545.) Accordingly, plaintiff's resignation at a date when he could not be fired was sufficient consideration for the agreement to pay the retirement funds unconditionally.

We therefore conclude that the defendant's third and last contention— that the plaintiff forfeited his rights in the retirement fund when he violated the terms of the restrictive covenant—is without merit.

We therefore affirm the judgment.

Affirmed.

SEIDENFELD, P. J., and GUILD, J., concur.