**ALLEN ARCHERY, INC.,**
**Plaintiff–Appellee,**

v.

**PRECISION SHOOTING EQUIPMENT,**
**INC., Defendant–Appellant,**

and

**Paul E. Shepley, Defendant.**

No. 88–1119.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 7, 1988.
Decided Jan. 20, 1989.

Jack Dominik, Dominik Stein Saccocio & Reese, Miami, Fla., for defendant-appellant.

D.A.N. Chase, Linde Thomson Fairchild Langworthy Kohn & Van Dyke P.C., Overland, Kan., for plaintiff-appellee.

Before WOOD, Jr., and COFFEY, Circuit Judges, and GRANT, Senior District Judge.*

HARLINGTON WOOD, Jr., Circuit Judge.

This is a contract case arising out of a patent license granted by plaintiff-appellee Allen Archery, Inc. ("Allen") to defendant-appellant Precision Shooting Equipment ("Precision") and Defendant Paul E. Shepley.[1] The parties dispute the amount of royalties due Allen for the use by Precision of Allen's invention. The district court found that Precision had incorrectly computed the royalties due under the licensing agreement and awarded Allen the sum of $395,913.59 plus costs in the amount of $3,536.11. Precision appeals.

■ Jurisdiction is based on diversity of citizenship. 28 U.S.C. § 1332.[2] Allen is a Missouri corporation with its principal place of business in Billings, Missouri, and Precision is a Delaware corporation with its principal place of business in Tucson, Arizona.

## I. FACTUAL BACKGROUND

On December 30, 1969, United States patent No. 3,486,495 entitled "Archery Bow with Draw Force Multiplying Attachments" was issued to Holless W. Allen. The patent was assigned to plaintiff-appellant Allen Archery, Inc. in 1973 and it expired in 1986. The patent relates to an archery bow known commonly to archers and the archery industry as the "compound bow."

The longbow or straight bow has been in existence for centuries and consists of a single piece of material with a single bowstring attached to the ends of the limbs. Another traditional bow, the recurve bow, is similar to the longbow, but its limbs curve forward at the tips where the bowstring is attached. The crossbow is a weapon having a short bow known as a "prod." The prod is mounted crosswise at the end of a stock. *See Allen Archery,*

---

* The Honorable Robert A. Grant, Senior District Judge for the Northern District of Indiana, is sitting by designation.

1. Defendant Paul E. Shepley's name was omitted from the notice of appeal and appellee's motion to dismiss defendant Shepley as an appellant was granted on August 8, 1988. *See Allen Archery, Inc., v. Precision Shooting Equipment, Inc., and Paul E. Shepley, Jr.,* 857 F.2d 1176, 1176–77 (7th Cir.1988) (per curiam).

2. This is not a case arising under the patent laws of the United States. 28 U.S.C. § 1338(a). Diversity of citizenship is needed for a federal court to have jurisdiction over a lawsuit involving a patent license agreement if the validity of the patent is not brought into question. *See Odell v. F.C. Farnsworth Co.,* 250 U.S. 501, 504, 39 S.Ct. 516, 517, 63 L.Ed. 1111 (1919) (suit involving royalties due on license agreement does not arise under patent laws); *Pratt v. Paris Gas Light & Coke Co.,* 168 U.S. 255, 260, 18 S.Ct. 62, 64, 42 L.Ed. 458 (1897) (suits over patent licenses require diversity).

*Inc. v. Jennings Compound Bow, Inc.*, 211 U.S.P.Q. 206 (C.D.Cal.1981), *aff'd*, 686 F.2d 780 (9th Cir.1982).

The compound bow system covered by Allen's patent employs rotatable pulleys or cams and multiple-line lacing of the bowstring or cable to create compound leverage. The important advantage of the compound bow, as opposed to more conventional bows, is that the compound bow casts an arrow at greater speed with increased striking power while reducing the amount of force needed to draw the bow. Reducing the peak pull force, the maximum force the archer has to apply in pulling the string back, improves sighting and steadies the archer's aim.

A compound bow comprises a handle section and a pair of limbs secured to the handle section. An eccentric wheel or cam is mounted on the end of each limb. A bowstring is trained around the wheels to present a central stretch and two end stretches. The central stretch includes a nocking point for receiving the nock or slotted tail of an arrow. The pulley wheels may be round or oval-shaped and are referred to as eccentrics since they are mounted off center in either case. *Id.*

The compound bow quickly became popular in archery circles. Within eight years of obtaining a patent, Allen had licensed virtually the entire archery industry. When the compound bow first appeared, all of the compound bows built under the licenses were modifications of the longbow or straight bow. Not until 1982 was a crossbow developed that used a compound bow prod.

Shepley entered the picture in 1973 when he obtained a license from Allen. Pursuant to an agreement dated July 1, 1973, Shepley became a licensee under the patent. Precision, a manufacturer of bows and archery accessories is a sublicensee under the patent pursuant to a sublicensing agreement with Shepley dated November 1, 1975. Shepley is founder and president of Precision.

The validity of the compound bow patent licensed to Precision was challenged in the United States District Court for the Central District of California. *Allen Archery, Inc. v. Jennings Compound Bow, Inc.*, 211 U.S. P.Q. 206 (C.D.Cal.1981), *aff'd*, 686 F.2d 780 (9th Cir.1982). While that litigation was progressing, Precision and Shepley brought a declaratory judgment action in the United States District Court for the Central District of Illinois claiming that the Allen patent was invalid. The district court in Illinois granted a preliminary injunction and escrow order. Royalties due under the licensing agreement were kept in escrow while the validity of the patent was being decided. After the Ninth Circuit in the *Jennings* litigation held that four of the patent claims were valid, the district court in Illinois found that the compound bows being built by Precision and Shepley were covered by those claims. The license agreement remained in force and all royalties kept in escrow were turned over to Allen.

That license agreement is the focus of this litigation. Allen conducted an accounting of the royalty payments being made by Precision and discovered what it claimed were incorrect royalty computations. The disputes between Allen and Precision center on their differing interpretations of the licensing agreement. The agreement basically gives Precision a license to manufacture, use, and sell "bows embodying the inventions covered" by the compound bow patent held by Allen. Precision had to pay royalties to Allen during the life of the agreement on each bow sold and on replacement parts. The royalty schedule provided that Precision pay a royalty of 5½ percent of the net selling price on the first 31,000 bows sold during a one-year period and a 5 percent royalty on any other bows sold during that same one-year period. The agreement stipulates that:

> Licensor agrees that royalties are not to be paid on accessories such as stabilizers and sights and their mountings, bow quivers and fish reels, which are invoiced, billed or sold as separate items from the complete basic operable bow.

Although a number of issues were raised in the district court concerning the construction of the licensing agreement, only

certain main points of dispute remain. Precision began manufacturing crossbows embodying the compound bow principle in 1982. Allen contends that the "complete basic operable bow" described in the licensing agreement includes both the stock and the prod of the crossbow. The Crossfire, Foxfire, and Spitfire crossbows, all manufactured and sold by Precision, utilize the compound principle. Precision argues that the "complete basic operable bow" is provided by the prod alone and that Allen is entitled to no royalties on the value of the stock. Precision notes that when a crossbow is shipped, the prod is not attached to the stock. Precision claims that the prod of the crossbow could be used as an operable bow. Precision values the prod alone at $75, an amount arrived at through a comparison with its regular bow line and also based on the manufacturing cost of the prod.

The parties also dispute the definition of accessories that are exempted from the royalty obligation. Allen contends that the overdraw mechanism which is standard equipment on the Mach II model bow is not an accessory. An overdraw is a device that enables a bow to shoot a shorter-than-normal arrow. The overdraw uses a ledge mounted on the side of the bow handle to support the tip of the arrow. The tip of the arrow can then be supported behind the handle of the bow and does not need to project forward from the front of the bow as is usually the case. Precision claims that the overdraw is an accessory since the Mach II could be a "complete basic operable bow" without it. Allen also asserts that the special camouflage paint applied to some bows is part of the basic bow since it is invoiced and billed as part of the basic bow price. Precision states that the special paint is in reality sold separately and the royalty obligation does not apply. Precision also disputes the computation of royalties on sales made outside the United States.

The district court, sitting without a jury, found that Precision was obligated to pay royalties to Allen on the full sale price of crossbows of the compound type rather than on a lesser price attributed to the prod

alone. The court also held that the overdraw mechanism on the Mach II model bow and the camouflage paint applied to some bows were not "accessories" and therefore not excludable from the royalty obligation under the licensing agreement. In addition, the court found that Precision was responsible for paying royalties on all bows shipped in foreign commerce, whether they were assembled, unassembled, or partially assembled.

## II. DISCUSSION

The district court correctly applied Illinois law. The issues revolve around the proper construction of the licensing agreement as it relates to crossbows and "accessories." *Richards v. Liquid Controls Corp.*, 26 Ill.App.3d 111, 325 N.E.2d 775 (1975), sets out the method for construing contracts in Illinois:

> The primary objective is to give effect to the intention of the parties. This is to be determined solely from the language used in the executed agreement when there is not ambiguity, but a strict construction which reaches a different result from that intended by the parties should not be adopted. Previous agreements, negotiations and circumstances may be considered in finding the meaning of the words used and when there is an ambiguity, or when the language used is susceptible of more than one meaning, extrinsic evidence is admissible to show the meaning of the words used.

*Id.* at 120, 325 N.E.2d at 781.

Precision asserts that the language of the licensing agreement is ambiguous and it disputes the meaning of such terms as "complete basic operable bow," "bows embodying the inventions covered by said patent," and "accessories ... invoiced, billed, or sold as separate items." The district court found that the language used in the agreement was not ambiguous. The court stated that there was no evidence before it concerning prior negotiations or agreements that could be considered in determining the meaning of the terms.

Examining the issue of how crossbows fit under the term "complete basic operable bow," the district court found that Precision was obligated to pay royalties on the full sale price of any crossbow embodying the Allen compound bow invention. The court rejected Precision's contention that the prod and the stock could be separated for the purposes of computing royalties. Finding that the agreement was meant to cover all bows embodying the inventions, the court stated that the stock of a crossbow was an integral part of the bow, not a mere accessory.

■ This court reviews the factual findings of a district court sitting without a jury under the clearly erroneous standard. Fed.R.Civ.P. 52(a). *See Anderson v. Bessemer,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985), *In the Matter of Muller,* 851 F.2d 916, 920 (7th Cir.1988). A review of the record indicates that the district court was correct in its determination that the entire sale price of a crossbow was subject to the royalty payment set forth in the licensing agreement. Precision, in paying royalties to Allen on its compound crossbow sales, had only paid royalties on the supposed value of the prod minus the stock. It unilaterally set this price at $75 per compound crossbow. Precision sold a large number of these compound crossbows, far more than its sales of conventional or noncompound crossbows. Each of these compound bows sold is marked with the Allen patent number.

It is strained logic to argue that because the prod can be separated from the stock, it can qualify as a "complete basic operable bow." In attempting to define those terms, we must find the "ordinary and usual connotation attributable to those words." *Union Carbide & Carbon Corp. v. Graver Tank & Mfg. Corp.,* 196 F.2d 103, 109 (7th Cir.), *cert. denied,* 343 U.S. 967, 72 S.Ct. 1059, 96 L.Ed. 1363 (1952). While it may be possible for some people to fire an arrow from the prod minus the stock, it is clear that an ordinary user would not consider the prod on its own to be a complete bow. The owner's manual shipped with every crossbow clearly ex-plains how the prod is to be mounted on the stock and drawn and shot only after it has been secured to the stock; nowhere is it suggested that the prod is operable as a separate unit. It is of no consequence that Precision did not manufacture crossbows at the time it obtained the license, since the agreement covers all bows embodying the patented principles, including those bows not yet designed or built. The district court's conclusion that royalties must be paid on the full sale price of the crossbows was correct.

The case of *Richards v. Liquid Controls Corp.,* 26 Ill.App.3d 111, 325 N.E.2d 775 (1975), presents a very similar fact situation. Richards was an inventor who developed equipment to improve the control of fluids for industry. Richards assigned his patents to AMMCO Tools, which agreed to pay 5 percent of the net selling price of every Air Eliminator sold embodying the inventions acquired from Richards and 2½ percent of other devices embodying those inventions. There was to be one payment on each complete device sold and no payments for repair or replacement parts. *Richards,* 26 Ill.App.3d 111, 115, 325 N.E. 2d 775, 777–78. The dispute there, as here, centered on what constituted a complete device. The assignee argued that the royalty did not apply to any device attached to parts actually embodying the invention. In *Richards,* the court found that the term "complete device" meant the invention plus all other parts attached to it. The court refused to restrict royalty payments solely to the patented portion of the complete devices sold. Payments were due on the price of any complete device so long as the device contained or embodied one of the inventions. *Richards,* 26 Ill.App.3d 111, 121–22, 325 N.E.2d 775, 783–84.

Precision rejects the guidance offered by the *Richards* case and argues that since the licensing agreement does not specifically detail how royalties should be apportioned for crossbows, overdraw mechanisms, and paint, the court should not include nonpatented elements in the determination of royalty obligations. Precision points to the case of *Velsicol Chemical Corp. v. Hooker Chemical Corp.,* 230

F.Supp. 998 (N.D.Ill.1964), for the proposition that royalties should be computed in proportion to the use of the patented device. However, the *Velsicol* case involves a situation that in many ways is unique to the chemical industry. In *Velsicol*, the defendant's patented end product used the plaintiff's patented chlorendic as an ingredient. Unlike the present case, *Velsicol* concerns products where both the component and the end product are patented by the respective parties. The proportionate use argument does not apply here where there is no issue of relative contribution between the parties. Precision also attempts to distinguish the *Richards* case by pointing out that it involved the assignment of a patent rather than the granting of a license, but this distinction does not change the *Richards* case's applicability to the present fact situation.

■ The lesson offered by the *Richards* case becomes more useful when we consider the question of whether the overdraw mechanism on the Mach II bow and the camouflage paint found on some bows qualify as accessories under the agreement. The district court found that they were not accessories within the meaning of the agreement and ordered that royalty payments be made on the full sale price of the bow including the overdraw and the camouflage paint. The district court emphasized the testimony of a Precision manager who stated that no accessories are attached to a bow when a bow is shipped. Working from that premise, the court determined that, since the overdraw mechanism and the camouflage paint were both attached to the bow when shipped, they could not be accessories.

While this proposition at first may seem to be an oversimplification, by looking closely at the licensing agreement, we conclude that the district court's finding that items attached to a bow cannot be accessories is correct. The licensing agreement provides that accessories will be excluded from royalty calculations if they are invoiced separately. Precision did not choose to invoice the paint jobs or the overdraw devices separately. It included them, as well as the crossbow stocks, in the invoice prices of the respective bows. This leads to the conclusion that they are part of the complete bow. Also, the agreement names items that it considers accessories, such as "stabilizers, sights, and their mountings, bow quivers, and fish reels." These items are all clearly separable from the "complete basic operable bow." Camouflage paint and overdraw mechanisms are not separable items and should not be considered as accessories.

■ Precision's final contention is that they are not liable for royalties on sales where they shipped unassembled bows outside the United States. The district court noted that Precision had accepted without objection a 1977 amendment to the royalty schedule providing that royalties would be paid on every bow regardless of what form it was sold in. The district court's finding that all foreign bow sales were subject to the royalty is not clearly erroneous and will not be disturbed.

■ Finally, Precision argues that by extending a patent to cover an indefinitely large proportion of a product, the patent can become invalid and unenforceable. However, Precision ignores the fact that this litigation is not about the validity of the Allen patent—that issue was settled in 1983. This is a contract case. We are concerned with the interpretation of a licensing agreement, not with the validity or invalidity of the patent itself.

### III. CONCLUSION

The district court correctly determined that the licensing agreement between Precision and Allen covered the full sale price of crossbows as well as camouflage paint and the overdraw mechanism on the Mach II bow. The judgment awarding Allen $395,913.59 plus costs is AFFIRMED.