**In re UNR INDUSTRIES, INC., Debtor.**

**Bankruptcy Nos. 82B9841 thru 82B9845, 82B9847, 82B9849, 82B9851.**

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

Sept. 16, 1997.

Robert D. Nachman, Chicago, IL, for Movant or Plaintiff.

Richard Smolev, Chicago, IL, for Respondent or Defendant.

## MEMORANDUM OPINION

ERWIN I. KATZ, Bankruptcy Judge.

These proceedings are before the Court in connection with the Motion of the Class 4 Disbursing Agent ("Disbursing Agent") for an Order Requiring the UNR Asbestos–Disease Claims Trust ("Trust") to Turn Over Proceeds of Stock. The parties' dispute concerns whether the Debtors' Consolidated Plan of Reorganization ("Plan") requires reallocation of only shares of stock or shares of stock plus dividends and interest earned on those dividends. The Court ordered an evidentiary hearing to be held, after finding that the Plan is ambiguous. An evidentiary hearing was held. After considering the arguments and evidence before it, and for the reasons stated herein, the Court hereby finds that Plan provisions for reallocation of Creditor Stock includes shares of stock plus dividends, but does not require the payment of interest earned on those dividends.

The Court issues its Findings of Fact ("Findings") and Conclusions of Law ("Conclusions") in accordance with Fed.R.Civ.P. 52(a) made applicable to these proceedings by Fed. R. Bankr.P. 7052(a). To the degree (if any) that the Findings as stated may be regarded as conclusions of law, they shall also be regarded as Conclusions. In the same way, to the degree that matters asserted as Conclusions may be thought of as findings of facts, they shall be regarded as Findings. *See Miller v. Fenton,* 474 U.S. 104, 113–14, 106 S.Ct. 445, 451–52, 88 L.Ed.2d 405 (1985).

## I. JURISDICTION

The Court has jurisdiction to entertain this matter pursuant to 28 U.S.C. § 1334 by reference from the United States District Court for the Northern District of Illinois under General Rule 2.33(A). This matter constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O).

## II. FINDINGS OF FACT

On July 29, 1982, UNR Industries, Inc. and ten of its affiliates filed voluntary petitions under Chapter 11 of the United States Bankruptcy Code ("Code"). On June 2, 1989, a Plan of Reorganization dated March 14, 1989 ("Plan"), which was proposed by UNR INDUSTRIES, INC., UNARCO INDUSTRIES, INC., UNR, INC., UNR–ROHN, INC. (Alabama), UNR–ROHN, INC. (Indiana), JOBAL TUBE CO., INC., UNR PRODUCTS, INC., and FOLDING CARRIER CORP. (collectively referred to herein as "Debtors") was confirmed by the Honorable David Coar of the United States Bankruptcy Court for the Northern District of Illinois.

Since the inception of the case, it was envisioned by the Debtors that the case would culminate in a plan of reorganization in which the debts would be capitalized, with the unsecured creditor bodies receiving equity interests in the reorganized entity as their recovery under the plan. It was envisioned by the Debtors that a certain percentage of the equity would be given to Debtors' preconfirmation shareholders and the remaining percentage would be given to various classes of Debtors' unsecured creditors.

To this end, the Debtors negotiated with various claimants including the Official Committee of Asbestos Related Plaintiffs ("Plaintiffs' Committee"), the Official Unsecured Creditors' Committee ("OUCC"), and Kevin M. Forde, the Legal Representative of those people who would manifest asbestos-related injuries after the confirmation of the Plan ("Future Claimants"). The claims and interest in the Plan were divided into the following six classes: 1) Priority Claims; 2) Workmens' Compensation Claims; 3) Secured Claims, as defined in Section 506 of the Code, asserted against the Debtor; 4) Unsecured Trade Claims and Other Unsecured claims; 5) Asbestos–Disease Claims; and 6) The interest of equity security holders of UNR Industries, Inc. Also included in Class 4 were the Asbestos–Property claims. The Asbestos–Property Claims were commonly referred to as "rip-out" claims. The Asbestos–Property claims represent claims to remove insulation manufactured with asbestos from buildings.

In the negotiations, Debtors were represented by the law firm of Schwartz, Cooper, Kolb & Gaynor. Malcolm M. Gaynor ("Gaynor") and Richard M. Bendix, Jr. ("Bendix"), principals of the firm of Schwartz, Cooper, Kolb, & Gaynor, worked extensively on the case. Gaynor was the drafter of the Plan while Bendix described himself as the "scrivener" of the Plan. J. William Cuncannan and Sarah Stegemoeller ("Stegemoeller"), among others, of the law firm of Defrees & Fiske, represented the Plaintiffs' Committee, whose constituency were included as part of Class 5 in the Plan. As noted, Kevin M. Forde was appointed Legal Representative of the Future Claimants ("Legal Representative"). Their claims were also included in Class 5 under the Plan. Also, Mr. Forde was represented by Mary Anne Mason ("Mason"). Prior to confirmation of the Plan, Neal Wolf ("Wolf") represented the OUCC. The claims of Wolf's constituency, namely trade claims and certain other unsecured claims other than Asbestos–Disease claims were included in Class 4 of the Plan. After confirmation of the Plan, Wolf was named Disbursing Agent for Class 4 creditor claims.

The Debtors did not conduct separate negotiations with the Plaintiffs' Committee, the Legal Representative, and the OUCC over the percentage of equity to be granted to their respective constituencies. Instead, the Debtors told the Plaintiffs' Committee, OUCC, and the Legal Representative to negotiate among themselves as to how to divide the equity that would be available to unsecured creditors (as opposed to Debtors' preconfirmation shareholders). Once that agreement was reached, the Debtors proposed to negotiate how much of the total equity would be allotted to unsecured creditors and how much would be allotted to the shareholders.

William L. Norton, Jr.[1] was appointed Examiner to help facilitate agreement among different groups regarding a plan of reorganization. In this role, Mr. Norton asked different creditor groups for their views of a possible plan. Wolf detailed the position of the OUCC to Mr. Norton in a letter and Statement of Position dated May 12, 1987 (Exhibit 3). The letter speaks of the relative distribution between what became Class 5 claims and Class 4 claims as a 2.27 to 1 ratio, with Class 5 getting the 2.27, with the added provision that any distribution to asbestos-property damage claims would reduce distribution to Class 5 and Class 4 in the same 2.27 to 1 relationship.

Originally there were to be no Asbestos–Property claims. Nevertheless some claims were filed in a substantial amount. Gaynor testified that after these claims were filed, when the parties studied the current draft of the Plan, it was decided that valid Asbestos–Property claims would "fall into Class 4, ... and obviously that was not fair." Gaynor further testified that Wolf informed him that negotiations between the Plaintiffs Committee, the OUCC, and the Future claimants had taken place and an accommodation had been reached by these parties. Gaynor testified he was informed by Wolf that these parties "wanted the burden of the rip out claims to fall between the [Class 4 and Class 5 claimants] in the same ratio, the 2.27 to 1," that they had agreed to with respect to the division of the total claims.

In a letter dated September 29, 1987, Stegemoeller confirmed her understanding of the agreements which then existed between the Plaintiffs' Committee and the OUCC as to the treatment of property damage claims. She stated: "Any stock distribution, dividend or other consideration to be issued to such [Asbestos–Property] claimants shall reduce the distribution to be paid to the Plaintiffs' Committee, the legal representative for putative asbestos-related claimants and the Unsecured Creditors' Committee [OUCC] in accordance with the ratio 2.27 for the Plaintiffs' Committee and legal representative to 1 for the OUCC." Stegemoeller's testified that her understanding of the 2.27 to 1 ratio was that the Ratio would apply to the relative distribution of the assets of UNR or the stock of UNR, depending on how that was ultimately divided in the Plan. At the time the Plan was drafted, she believed that it was still "somewhat up in the air" about what would ultimately be received by the parties.

In August of 1988, the Debtors' attorneys were preparing a new disclosure statement as well as an amendment to the Plan. At this time, Gaynor realized that it would not possible to determine the amount of all Class 4 claims prior to confirmation of the Plan. The Debtors' attorneys raised this timing issue in a letter to the attorneys for the Plaintiffs' Committee and the Legal Representative, among others, a copy of which was sent to Wolf, in which Gaynor stated:

> In preparing the disclosure material, it became apparent to us that it will be impossible at the Effective Date to determine the portion of Creditor Stock to be issued to the holders of Class 4 claims and to Asbestos Health Claimants. That determination cannot be made until the aggregate Allowed Amount of all Class 4 claims becomes known. Therefore, to give effect to the provisions of the Plan allowing sale of the Creditor Stock by Trustees for the benefit of creditors, we have made the enclosed modifications to the Plan.

With the letter a new draft of the plan was enclosed. This draft contained, for the first time, Paragraph G of Article IV ("Paragraph

1. Mr. Norton is a former bankruptcy judge, lecturer and educator on bankruptcy law.

IVG") in close to its final form. This is the paragraph that sets up the mechanism of issuing shares of Creditor Stock to the Trustees which are subject to reallocation to the Class 4 Disbursing Agent when the amount of all Class 4 claims is known ("Reallocation Mechanism").

This draft also contains a revised version of the definition of Creditor Stock. Creditor Stock is defined in that draft as "42,413,847 shares of the *common stock* of New UNR (representing 92% of the shares of New UNR) to be issued and outstanding as soon as practicable after the Effective Date, *or the Proceeds of the sale thereof.*" (emphasis in original.) Gaynor testified that he expanded the definition of Creditor Stock to include the words "or the Proceeds of the sale thereof" because of his concern the company might be sold before the complete distribution of Creditor Stock and his desire that the Plan provisions concerning the allocation and distribution of Creditor Stock also apply to any consideration received from the sale of such stock.

Before filing the "final version" of the Plan, Gaynor again altered the definition of Creditor Stock. The new definition as used in the Plan is "Creditor Stock" ... "42,404,847 shares of the common stock of New UNR (representing 92% of the shares of New UNR) to be issued and outstanding as soon as practicable after the Effective Date *or the proceeds thereof.*" Despite this alteration, all the parties who testified regarding the negotiations of the Plan do not recall any discussion of the meaning of the term "proceeds."

Gaynor testified that he made the change because he found the term "proceeds of sale ... too restrictive." Gaynor testified that he intended "proceeds" to include "everything, dividend or the like, anything that the stock was changed into." Gaynor's normal procedures with drafts of the Plan was to circulate the Plan and have a meeting at which all of the representatives of the constituents were present. However, Gaynor was unable to get any confirmation that the Plaintiffs' Committee had agreed to the Plan. Ultimately, the Debtor decided to just file the Plan without an agreement and let the various constituencies vote on the Plan.

During the negotiations, Gaynor testified that he was not always aware of whether the distribution to the Class 5 claimants was going to be to a trust. However, by the time the Plan was negotiated and presented to the voting constituencies and the Court for confirmation it had been determined that the distribution would be to a Trust or Trustee. However, neither Gaynor, Wolf, Bendix, the Legal Representative, or the representative of the Plaintiffs' Committee looked into what the legal consequences of a Trust would be to the Reallocation Mechanism if dividends were paid on the reserved stock after the Effective Date.

The Plan also provides ("Paragraph IVF") that the Board of Directors of New UNR initially would be composed of eleven members, three chosen by the Court after receipt of recommendations from the Legal Representative, three chosen by the Plaintiffs' Committee, three chosen by the OUCC, and two representing the pre-confirmation shareholders of the Debtors.

The Disclosure Statement which accompanied the final version of the Plan, in a section entitled "Overview of Plan," described the agreement of Class 4 and Class 5 claimants as follows: [Paragraph E.1, p. 10.]

The Plan calls for 42,404,847 shares of the common stock of reorganized UNR, 92% of the common stock of new UNR or the proceeds of the sale thereof, to be distributed to or for the benefit of unsecured creditors and Asbestos Disease Claimants. [T]he negotiators agreed to divide whatever recovery they [Class 4 and Class 5 Claimants] ultimately received under the Plan on a 2.27 to 1 basis. As creditors will receive in total 92% of the stock of New UNR, the amount allocated to Asbestos–Disease claims is 63%, reduced by a share of the Asbestos–Property Damage claims also calculated on the 2.27 to 1 basis.

Apparently nobody noticed that the definition of Creditor Stock in the Plan Overview retained the phrase "or the proceeds of the sale thereof" while the phrase "or the proceeds thereof" was used in the Plan. However, the Disclosure Statement clearly states, in capi-

tal letters, that "IN THE EVENT OF ANY CONFLICT OR INCONSISTENCY BETWEEN THE PLAN AND THIS SUMMARY, THE PROVISIONS IN THE PLAN CONTROL." Paragraph E, p. 10. The Disclosure Statement further states (Paragraph E.1.a., p. 10):

The precise number of shares available to such Trust for the benefit of Class 5 claimants will not be known until the aggregate allowed amount of all Class 4 claims has been determined. However, approximately 29,440,000 shares, approximately 63% of the shares of New UNR would have been available for Class 5 if there were no Asbestos–Property Claims allowed.

To solve the timing problem created by the Asbestos–Property Claims, Paragraph IVG, the Reallocation Mechanism, provided that the Class 5 representative would originally receive 63% of the shares of New UNR, but that the shares would be partially reallocated in future:

[T]he Trustees of a UNR Asbestos–Disease Claims Trust or the Class 5 Trustees, whichever are then acting, shall at all times reserve and keep available that number of shares of Creditor Stock as may be necessary to reallocate Creditor Stock between the Class 4 Disbursing Agent and the Trustees of a UNR Asbestos–Disease Claims Trust or the Class 5 Trustee, whichever are then acting, as hereinafter provided.

When the aggregate allowed amount of all Class 4 claims becomes known, the Creditor Stock shall be reallocated between the Class 4 Disbursing Agent and the Trustees of a UNR Asbestos–Disease Claims Trust or the Class 5 Trustees, whichever are then acting, so that the Class 4 Disbursing Agent holds that number of shares of the creditor stock necessary to satisfy the aggregate allowed amount of Class 4 claims, pursuant to the provisions of Article III of the Plan, and the Trustees of the UNR Asbestos–Disease Claims Trust or the Class 5 Trustees, whichever are then acting, hold the remaining shares.

The Plan was then accepted by the Creditors and confirmed by the Court despite the in-

consistency between the Plan and the Disclosure Statement.

The Plan called for the creation of the UNR Asbestos–Disease Claims Trust ("Trust"). A purpose of the Trust is "to use the assets of the Trust Estate not otherwise reserved." Exhibit T–2, *Report of the Trustees of the UNR Asbestos–Disease Claims Trust for Fiscal Year Ended December 31, 1994,* Notes To Special–Purpose Financial Statements, n. 1 paragraph 2. The Trust is also required to "keep available that number of shares of UNR common stock or the proceeds therefrom as may be necessary to distribute such stock between unsecured creditors of UNR and the Trustees according to a formula set forth in the Plan." *Id.* at n. 1 paragraph 3.

After the confirmation of the Plan, the Debtor became very profitable and paid out dividends on the new UNR common stock. Charles Murdock, one of the Trustees, testified in a deposition that during this time, "in making [the] determination as to what to pay the asbestos victims . . . [the Trustees] have taken into account the fact that those dividends were [the Trusts']." As a result, there may be "a modest misallocation between . . . the presen[t] and the future [claimants]." Furthermore, Murdoch testified the Trust paid federal income taxes on these dividends and counsel had informed him that these taxes paid by the Trust could not be recouped at this point.

The Trustees prepared a yearly accounting pursuant to Section 7.14 of the Trust. Pursuant to this provision, the Trustees shall be discharged from any further liability or responsibility to any person holding an Asbestos Disease Claim or other Person, as to all matters embraced in such account. Exhibit T–1, *Trust Agreement,* Section 7.14. Since Confirmation of the Plan, the Trustees have filed annual reports which state their activities with the Bankruptcy Court. Included in these reports were special purpose financial statements of the UNR Asbestos–Disease Claims Trust. These statements had Notes to the Special Purpose Financial Statements. In the statement for the fiscal year ended December 31, 1994, the notes indicated the trust was obligated "to distribute approxi-

mately 91,000 shares of its UNR stock, ... to the disbursing agent to fund settled property damage claims." *Id.* at n. 9 paragraph 2. In statement for fiscal year ended December 31, 1995, the notes indicated an obligation to distribute approximately 89,000 shares of stock. Exhibit T–3, *Report of the Trustees of the UNR Asbestos–Disease Claims Trust for Fiscal Year Ended December 31, 1995,* Notes To Special–Purpose Financial Statements, n. 8 paragraph 2. According to Murdoch, the annual reports were presented to Bankruptcy Court. Wolf testified that he reviewed the annual reports which the Trustees filed every year very generally and quickly.

The final Class 4 claim has been liquidated, and the final aggregate amount of the Class 4 claims has been ascertained. As a result, under the Reallocation Mechanism, the Trustees were required to turn over to the Disbursing Agent 88,953 shares of New UNR stock. Whether they were also required to turn over dividends earned on the stock, and investment income from the dividends, is the subject of this proceeding. The Trustees turned over 89,097 shares, and the Disbursing Agent has agreed to return 144 shares to the Trustees. Since the confirmation of the Plan, the 88,953 shares of New UNR stock have generated $671,595.15 in gross dividends or $642,363.36 net of tax. The Trust has realized interest income on account of the investment of these dividends in the gross amount of $122,929.66, or a net of tax amount of $74,766.24.[2]

## III. CONCLUSIONS OF LAW

The Disbursing Agent seeks to have the Trustees pay to the Disbursing Agent $794,524.81 consisting of dividends in the amount of $671,595.15 on the shares of new UNR common stock plus interest on those dividends in the amount of $122,929.66, pursuant to the Reallocation Mechanism of the Plan.

### A. Construing the Meaning of the Plan

■ In general, a plan of reorganization should be analyzed according to the principles of state contract law. *UNR Indus., Inc. v. Paterson Factory Workers,* 176 B.R. 472, 474 (N.D.Ill.1994). Since the Plan was confirmed in Illinois, it is clear this action is governed by Illinois law. In Illinois the rules for construction of contracts have been long established. The primary goal is to give effect to the intention of the parties. *See Allen Archery, Inc. v. Precision Shooting Equip., Inc.,* 865 F.2d 896, 899 (7th Cir.1989); *Richards v. Liquid Controls Corp.,* 26 Ill. App.3d 111, 325 N.E.2d 775, 781 (1975); *see also UNR Indus., Inc. v. Bloomington Factory Workers,* 173 B.R. 149, 157 (N.D.Ill. 1994). The starting point in the search for the intention of the parties is the contract itself. *Matter of Lefkas Gen. Partners,* 112 F.3d 896, 901 (7th Cir.1997) (citing *Atlantic Mut. Ins. Co. v. Metron Eng'g & Constr. Co.,* 83 F.3d 897, 898 (7th Cir.1996) (citation omitted)). If the plain language of a contract is unambiguous then the express provisions govern and there is no need for further inquiry into the intention of the parties. *Id.; Taracorp, Inc. v. NL Indus., Inc.,* 73 F.3d 738, 743 (7th Cir.1996) (citing *Lumpkin v. Envirodyne Indus., Inc.,* 933 F.2d 449, 456 (7th Cir.) (internal citations omitted), *cert. denied,* 502 U.S. 939, 112 S.Ct. 373, 116 L.Ed.2d 324 (1991)); *P.A. Bergner & Co. of Ill. v. Lloyds Jewelers, Inc.,* 112 Ill.2d 196, 97 Ill.Dec. 415, 418, 492 N.E.2d 1288, 1291 (1986); *see Bloomington Factory Workers,* 173 B.R. at 157. However, if the contract is ambiguous then "the Court must go on to declare [the contract's] meaning." *Taracorp,* 73 F.3d at 743.

■ Previously, this Court found as a matter of law that the Plan was ambiguous on its face. It is unclear from the Plan whether the phrase "or the proceeds thereof" includes dividends and the interest earned on those dividends. Therefore, the Court must look to the extrinsic evidence and the appli-

---

**2.** The Trustees and the Disbursing Agent have stipulated to the Court the amount of interest earned on the dividends in dispute up to December 31, 1996. The Disbursing Agent has requested that the Court grant interest on the dividends up to the time the dividends are turned over to the Class 4 Disbursing Agent. The Court is unable to calculate the amount of interest after December 31, 1996 from the evidence presented by the parties. In light of the Court's disposition of the interest issue, the Court is not required to perform such a calculation.

cable rules of contract construction to determine the intention of the parties. *Id.* The intention of the parties will be determined by an examination of all the facts shown by the evidence, including the relationship of the parties, the conduct of the parties, the contract's subject matter or purpose, and any of the surrounding circumstances in the making of the contract. *Harris Trust and Sav. Bank v. Hirsch,* 112 Ill.App.3d 895, 68 Ill. Dec. 383, 387, 445 N.E.2d 1236, 1240 (1983). In addition, the Court applies basic rules of construction so that the contract may be construed in a manner which gives meaning to each term in accordance with the understanding that this language was purposely chosen by the parties. *Atlantic Mut. Ins. Co. v. Metron Eng'g and Constr. Co.,* 83 F.3d 897, 900 (7th Cir.1996); *Wilson v. Illinois Benedictine College,* 112 Ill.App.3d 932, 68 Ill.Dec. 257, 263, 445 N.E.2d 901, 907 (1983).

■ The contract itself is the starting point for determining the intentions of the parties. The Trustees argue that even if the term "proceeds" should be interpreted so as to include dividends and interest on those dividends, the Reallocation Mechanism language requires that, after the reallocation, the Class 4 Disbursing Agent would hold "shares of Creditor Stock" while the Class 5 Trust would "hold the remaining shares." As a result, the Trustees contend, the operative language of the Reallocation Mechanism does not require the reservation of proceeds, because if the drafters wanted to include proceeds they would have done so by using the term Creditor Stock. Moreover, the Trustees state that the inclusion of one term to the exclusion of another is deemed to be an intentional exclusion, since there is a presumption in Illinois against reading into a contract provisions which "easily could have been included in [a] contract but were not." *Wright v. Chicago Title Ins. Co.,* 196 Ill. App.3d 920, 143 Ill.Dec. 576, 579, 554 N.E.2d 511, 514 (1990).

The Disbursing Agent argues that the Trustees' point misses the target. A contract must be read in its entirety and "the meaning of separate provisions should be considered in light of one another and in the context of the entire agreement." *Taracorp,*

73 F.3d at 745; *see Medcom Holding Co. v. Baxter Travenol Labs., Inc.,* 984 F.2d 223, 226 (7th Cir.1993). In addition, the Court is to "construe a contract so that each provision is given full force and effect and so that the terms make sense when read together." *Medcom,* 984 F.2d at 227 (internal citations omitted). The Reallocation Mechanism initially states "the Creditor Stock shall be reallocated between the Class Disbursing Agent and the Trustees of a UNR Asbestos–Disease Claims Trust." The Reallocation Mechanism than goes on to state, as noted above, that after the reallocation the Class 4 Disbursing Agent and the Class 5 Trust shall have shares of Creditor Stock. If the provision is given the Trustees' interpretation, the Plan would require a proceeds reallocation by the Class 5 Trustee without a corresponding recipient identified, since the Trustees and the Disbursing Agent only receive shares.

As the Disbursing Agent notes, the Trustees' interpretation also renders the preceding passage of the Plan inconsistent. The passage states in part: the [Trustees] "shall at all times reserve and keep available that number of shares of Creditor Stock as may be necessary to reallocate Creditor Stock between the Class 4 Disbursing Agent and the Trustees...." The Disbursing Agent argues that under the Trustees' interpretation, this passage would not require the reservation of proceeds by the Trustees, since the passage uses the phrase "shares of Creditor Stock." This passage also contains the opposite problem. The Trustees would still be required to make a proceeds reallocation, since the passage requires the Trustee "to reallocate Creditor Stock," a phrase that includes proceeds while not requiring the Class 5 Trust to reserve proceeds.

"It is the duty of the court to determine which of two clauses most clearly expresses the chief object and purpose of the contract." *Harris,* 68 Ill.Dec. at 387, 445 N.E.2d at 1240. For this purpose the Court may look to extraneous evidence. *Id.* A review of the ancillary documentation does not yield a definitive result. The Disclosure Statement suffers from the same inconsistency as the Plan. In fact, it uses the identical passages as

those in the Plan. Further, the evidence shows that those who drafted and negotiated the Reallocation Mechanism at a minimum drafted for the contingency of a sale of any stock issued under the Plan and that at least the proceeds from such a sale would be required to be reserved and possibly reallocated by the Trustees.

Next, the Trustees argue that Illinois trust law confirms the conclusion that dividends on the reserved shares of stock and interest earned on the dividends belong to the trust. First, the Trustees note that under Illinois trust law cash dividends are income. 760 Ill. Comp. Stat. 15/7(d) (West 1996). Further, Illinois trust law presumes that, unless otherwise provided, trust income belongs solely to the current beneficiary at the time the income is received. *See Whiting v. Hagey*, 366 Ill. 86, 7 N.E.2d 885, 887 (1937); *De Koven v. Alsop*, 205 Ill. 309, 68 N.E. 930 (1903); *Burns v. Hines*, 298 Ill.App. 563, 19 N.E.2d 382 (1939). The Trustees next argue that the Class 4 claimants rights under the Trust are analogous to those of a remainderman or subsequent beneficiary and that the Class 5 claimants are the sole current beneficiaries of the Trust. Therefore, under the Trust the Class 5 claimants are entitled to the cash dividends.

The Trustees argument fails because the Trust has contrary terms. As noted previously, the Trust must "keep available that number of shares of UNR common stock or the *proceeds* therefrom as may be necessary to distribute such stock between unsecured creditors of UNR and the Trustees according to a formula set forth in the Plan." (emphasis added). Therefore, the Class 5 claimants have no claim upon the "proceeds" of the reserved stock and as will be shown infra, "proceeds" includes dividends on the reserved shares of new UNR common stock.

### 1. *Proceeds*

The Plan requires the Trustees to turnover any proceeds from the stock reserved pursuant to the Reallocation Mechanism of the Plan. Both parties contend that the term "proceeds" is not ambiguous. As a consequence, both parties present the Court with their interpretation of the term "proceeds." Neither the Bankruptcy Code nor its legislative history define the term "proceeds." [3] The Trustees' quote the Seventh Circuit to the effect that "proceeds" is to be defined narrowly. *Matter of Schmaling*, 783 F.2d 680 (7th Cir.1986). *Schmaling* states that proceeds is that which is "received upon their sale, exchange, collection or other disposition.". *Id.* at 682. In response, the Disbursing Agent quotes two dictionaries to define "proceeds" more broadly. One dictionary defines the term as "[t]hat which results, proceeds, or accrues from some possession or transaction, esp. the amount realized from the sale of property, as the proceeds of a sale, of a year's labor, etc." *Webster's New International Dictionary* 1972 (2nd Ed.1957). The other dictionary includes, within the definition of the term, "[i]ssues, income, yield, receipts, produce, money or other thing of value arising or obtained by the sale of property, the sum, amount, or value of property sold or converted into money or into other property ...; [or][t]hat which results, proceeds, or accrues from some possession or transaction." *Black's Law Dictionary* 1204 (6th Ed.1990) (internal citations omitted).

The Court finds that case law does not provide a common definition of the term "proceeds," which would apply to all uses. The *Schmaling* case is inapposite. *Schmaling* is a case of statutory construction, which deals with the then current, since changed, definition of proceeds under the Uniform Commercial Code, specifically § 9–306(2).[4] *Schmaling*, 783 F.2d at 682. In the instant

---

3. Although, under 11 U.S.C. § 552(b) of the Code, "the term 'proceeds' is not limited to the technical definition of the UCC, but covers any property into which property subject to the security interest is converted." H.R.Rep. No. 595, at 376–377 (1977).

4. § 9–306(2) stated in 1989:

Except where this Act otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof unless the disposition was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds, including collections received by the debtor.

case, the Plan is not under the auspices of the Uniform Commercial Code. The definition of "proceeds" depends upon the context in which it was analyzed. The Seventh Circuit has also defined the term in other statutory cases *See United States v. Masters,* 924 F.2d 1362, 1369–70 (7th Cir.1991) (In analyzing a forfeiture statute, 18 U.S.C. § 1963(a)(3), the court held that "the proceeds to which the statute refers are net, not gross, revenues," or in other words, "profits" or "gains."); *United States v. 122,942 Shares of Common Stock of Firstrock Bancorp, Inc.,* 847 F.Supp 105, 107 (N.D.Ill.1994) (In analyzing forfeiture Statute under 18 U.S.C. § 981, the Court defined proceeds as the net amount received instead of the gross amount received.).

## 2. *Evidence of Intent*

Both sides presented evidence as to what their various expectations were as to the definition of "proceeds." For instance, Gaynor, the drafter of the Plan, testified that he intended the phrase "proceeds" to include "everything, dividend or the like, anything that the stock was changed into." Similarly, Wolf testified that "proceeds would include dividends which might have been paid on the account of holding such reallocated shares, and any investment income that might have . . . flowed from the investment of such dividends." Stegemoeller testified in her deposition that her understanding of "proceeds as it was used in the Plan related to the sale or liquidation of the stock being issued under the Plan." Mason recalls thinking there might be a stock distribution unless there was a takeover of the Debtor. Moreover, Mason testified that she has no specific understanding as to whether dividends were to be included as "proceeds" or not. However, the intent of parties is not inferred by the reading of individuals minds; instead, contractual obligations are created and defined by the objective signals the parties exchange. *See Pratt Central Park Ltd. Partnership v. Dames & Moore, Inc.,* 60 F.3d 350, 355 (7th Cir.1995) (decided under Illinois law). Under Illinois law, a particular interpretation that a party may have at the time the contract was executed is irrelevant. *Id.; Midland Hotel Corp. v. Reuben H. Donnelley Corp.,* 118 Ill.2d 306, 113 Ill.Dec. 252, 256,

515 N.E.2d 61, 65 (1987); *Klemp v. Hergott Group, Inc.,* 267 Ill.App.3d 574, 204 Ill.Dec. 527, 533, 641 N.E.2d 957, 963 (1994). Instead the Court looks to what occurred between the parties. *Pratt,* 60 F.3d at 355.

Gaynor testified that when drafting the Plan there was uncertainty as to what would happen to the company after confirmation. Further, in a letter sent to the attorneys for the Plaintiffs' Committee and the Legal Representative, among others, and which was copied to Wolf, Gaynor stated that as it would be "impossible as of the effective date to determined the portion of Creditor Stock to be issued to the holders of Class 4 claims," thus modifications were made in the proposed Plan. The letter enclosed the modifications and included for the first time the Reallocation Mechanism in Paragraph IVG in close to the form as it appeared in the Plan. Gaynor testified that he included the Reallocation Mechanism in the plan to give effect to the creditors agreement. The modifications also included a revision of the definition of Creditor Stock. Creditor stock is defined in this draft as " shares of the common stock of New UNR, . . . or the Proceeds of the sale thereof." Subsequently, Gaynor testified he eliminated the words "of sale thereof" from his 1988 draft of the Plan, because it became apparent to him it was "too restrictive" and that he intended to include "everything, dividend or the like, anything that the stock changed into." As a result, the Plan itself defines Creditor Stock as "42,404,847 shares of the common stock of New UNR . . . or the proceeds thereof."

The Trustees argue that the parties only drafted for the contingency that any stock issued might be sold, not that it might be held long enough to earn dividends. The Trustees point to the testimony of Bendix, that when he drafted the Plan he never "specifically focused" upon the possibility that the stock might earn cash dividends because he speculated that the new UNR might be sold. Furthermore, Stegemoeller in her deposition testified that a possible sale of UNR had been a scenario that was "riding along with this reorganization." Also, Stegemoeller does not have any specific recollection of the discussion of any events other

than a sale during the intervening period the between the effective date of the Plan and the date of reallocation. Moreover, that the evidence shows there was no discussion among the parties to the negotiations about dividends on the reserved stock.

Although there was no discussion among the negotiating parties about the possibilities of a dividend on the reserved stock, there was a change in the draft definition of Creditor Stock. The Court finds this change in terminology shows an unmistakable intent to broaden what was included in Creditor Stock beyond the "proceeds from sale." The Trustees essentially argue that this change is meaningless—that the parties only contemplated the possibility of a sale. However, as previously noted the inclusion of one term to the exclusion of another is deemed to be an intentional exclusion. *Wright*, 143 Ill.Dec. at 579, 554 N.E.2d at 514. The Court finds that since the parties excluded the term "of the sale," the term "proceeds" includes events beyond a sale, and the term should be read broadly.

A broad reading of the term "proceeds" would include dividends from the stock. Dividends are a yield of shares. They are income earned from the stock. Therefore the Court finds that the phrase "or the proceeds thereof" includes dividends on the reserved stock. Furthermore, this interpretation comports with the basic concepts inherent in the Plan, that is reallocation together with maintenance of the 2.27 to 1 ratio of distribution. Thusly, the ratio would be consistent with a meaningful reallocation. The parties agreed to divide whatever recovery they received at a 2.27 to 1 ratio. The Reallocation Mechanism was designed to maintain this ratio despite the impossibility of determining the relative entitlements of the Class 4 and Class 5 claimants. The Class 5 claimants were not supposed to get a windfall because of the delay in determining the total amount of the Asbestos–Property claims. The inclusion of dividends in "proceeds" prevents this, by placing the parties in the same position which they would have been if the amount of the asbestos property claims had been known at the confirmation date, and the allocation of the shares had been made at the 2.27 to 1

ratio. The shares of new UNR common stock have now been divided at a 2.27 to 1 ratio. The Class 4 claimants should receive the benefit of the dividends on the reserved stock, as if the aggregate amount of Asbestos–Property Claims had been known as of the confirmation date.

### 3. *Interest*

 The Court finds that the Trustees do not have to turnover the interest earned by the investment of the dividends. "The rights of parties to a contract are limited by the terms expressed in the contract; a court will not rewrite a contract to suit one of the parties but, will enforce the terms as written." *Wright*, 143 Ill.Dec. at 579, 554 N.E.2d at 514. "There is a strong presumption against provisions that could have been included in the contract but were not." *Id.* Although, dividends are included within the broad contemplation of "the proceeds thereof," there is no evidence that the parties contemplated the type of earnings giving rise to interest on the dividends.

The Reallocation Mechanism required the Trustees to reserve shares of new UNR common stock or the proceeds thereof. As noted earlier, the evidence shows the parties contemplated that "proceeds" were to be whatever "the stock changed into," or what the shares themselves yield, such as dividends. Interest results from the investment of the dividends. Interest is earned by business activity of the trust. The decisions whether to invest, how to invest, or when to invest are all within the discretion of the Trustee and therefore represent a yield from the operations of the Trust rather than a yield from the dividends themselves.

### 4. *Taxes*

 The Court finds that "proceeds" refers to the net amount received. In a cash sale of the new UNR common stock, the seller would unquestionably receive the market price of the stock less any transaction costs. The seller would also owe tax on any recognized gain.

Again, to require the Trustee to bear the tax burden would disrupt the 2:27/1 ratio once again. Such an inequitable result could not have been intended.

## B. Res Judicata

 Finally, the Trustees makes a claim of res judicata. Under Illinois law, to properly apply res judicata, a decision must involve "(1) identity of parties or privies in the two suits; (2) identity of causes of action in the prior and current suit; and (3) final judgment on the merits in the prior suit." *Lolling v. Patterson,* 966 F.2d 230, 235 (7th Cir.1992), (*quoting Schlangen v. Resolution Trust Corp.,* 934 F.2d 143, 145–146 (7th Cir. 1991)).

The Trustees res judicata claim is based on section 7.14 of the Trust. Pursuant to this provision, the Trustees shall be discharged from any further liability or responsibility to any person holding an Asbestos–Disease Claim or other Person, as to all matters embraced in such account. The Trustees have filed annual reports which state their activities. Further, the Court takes judicial notice of all of its orders and pleadings, including all of the Trustees' annual reports and the orders discharging the Trustees. As the Trustees were discharged from all claims relating to the period of the annual report in accordance with the terms of the Trust, the Disbursing Agent is barred by res judicata from making a claim for the dividends.

There has been no adjudication of the current question. The issue is whether the Trustee must turn over the dividends on the reserved stock. The Plan required the Trustee to reserve the stock until the total aggregate Allowed Amount of Class 4 claims was known, at that point the Trustee must make the necessary reallocation. The Trustee could argue that they were freed from liability to reserve the dividends after the accounting. However, the reallocating of the dividends is a new issue and the amount of the reallocation is being decided by the Court for the first time. Therefore, the Class 4 Disbursing Agent is not barred from bringing this case before the Court.

## IV. CONCLUSION

For the foregoing reasons, the Court finds the parties intended to include dividends on the new UNR common stock in the final reallocation under the 2:27/1 ratio, but did not intend to include interest earned by the Trust. Therefore, the Court will order Trustee to pay $642,363.36, the stipulated amount representing dividends earned by the shares after deduction of taxes paid on these dividends.